[No. S157980. Aug. 24, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDER MOYE, Defendant and Appellant.

540

## COUNSEL

Patricia A. Scott, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson, Kristofer Jorstad and Elaine F. Tumonis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendant, who bludgeoned his victim to death with a baseball bat, was convicted of second degree murder. The jury was instructed on, and rejected, both a justifiable homicide defense based on reasonable self-defense, and unreasonable or imperfect self-defense, which would have supported conviction of the lesser included offense of voluntary manslaughter. The trial court refused a defense request to further instruct the jury on a sudden quarrel/heat of passion theory of voluntary manslaughter. The Court of Appeal disagreed with this ruling, found the instructional error prejudicial, and on that basis reversed defendant's murder conviction.

We conclude the evidentiary record supports the trial court's determination that there was insubstantial evidence to warrant instruction on a

sudden quarrel/heat of passion theory of voluntary manslaughter. In particular, substantial evidence was lacking that defendant killed while subjectively under the actual influence of "a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." [Citation.]' [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 163 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*).) Defendant's own uncontested testimony established he did not act rashly, or without due deliberation and reflection, or from strong passion rather than from judgment, when he claimed to have used the bat defensively to allegedly fend off an attack from the homicide victim.

In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense. (*Breverman, supra*, 19 Cal.4th at pp. 162–163.) But no principle of law required the trial judge below to disregard all the evidence bearing on defendant's state of mind at the time of the killing in order to find the jury should consider whether he subjectively killed under the heat of passion, when no substantial evidence supported that theory of manslaughter, and the only evidence actually introduced on the point, the defendant's own uncontested testimony, was plainly to the contrary.

Assuming arguendo it was error to fail to instruct on heat of passion voluntary manslaughter on this factual record, we find any such error harmless under the applicable *Watson* test (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*)). Here, the jury considered virtually all of the defense evidence bearing on defendant's state of mind and the question whether he harbored malice when it entertained his claim of unreasonable or imperfect self-defense. Having rejected that claim, the jury likewise rejected the factual basis for a finding of provocation legally necessary to support a heat of passion/voluntary manslaughter defense. Upon examining the entire cause, including the evidence (Cal. Const., art. VI, § 13), it is not "reasonably probable" defendant would have obtained a "more favorable" outcome had the instructional error not occurred. (*Watson, supra*, at p. 836.) Accordingly, the judgment of the Court of Appeal will be reversed.

### FACTS AND PROCEDURAL BACKGROUND

Defendant Alexander Moye and codefendants Daniel Avendano and George Lopez were jointly tried for the murder of Mark Urrutia. The jury convicted

defendant of second degree murder (Pen. Code, § 187, subd. (a)),[1] further finding that he personally used a deadly weapon (a baseball bat) in the commission of the murder (§ 12022, subd. (b)(1)).[2] In a bifurcated court trial, defendant's prior felony convictions of assault with a deadly weapon (§ 245, subd. (a)), alleged as a serious felony within the meaning of the "Three Strikes" law (§ 667, subds. (a)–(i)), and receiving stolen property (§ 496, subd. (a)), were found true. Defendant was sentenced to state prison for 15 years to life for second degree murder, doubled under the Three Strikes law (§ 667, subds. (a)–(i)), with a five-year enhancement for the prior serious felony allegation and a consecutive one-year enhancement for use of a deadly weapon, for a total term of 36 years to life.

### The Fight on Saturday Evening

On Saturday evening, February 11, 2006, defendant was living with his girlfriend, Kandie Sanchez, her mother, and her daughter, Jessica, at the Sanchez residence on Paso Real in Rowland Heights. According to defendant, he got into an argument with Kandie's mother, who wanted him to leave. He then started arguing with Jessica, who commented that she was going to summon her boyfriend, Ronnie Urrutia. Ronnie had a brother, Mark Urrutia, the homicide victim in this case. Ronnie and Mark lived approximately one block from the Sanchez residence.

At some point in the evening, Ronnie received a phone call from his girlfriend, Jessica, informing him that defendant was bothering her. She then called back to tell Ronnie that defendant was waiting to fight him in front of the Sanchez residence. Ronnie went to the Sanchez house with his brother Mark and three friends, Carlos, Ruben and Rudy. Upon the group's arrival, defendant and Ronnie got into an argument that quickly escalated into a fistfight on the neighbor's front lawn. At one point Ronnie's brother Mark got involved, twice hitting or tapping defendant in the back with a silver and blue aluminum baseball bat he had retrieved from their car. Two of defendant's associates were also present, codefendants Avendano and Lopez. Although they did not become directly involved in the fistfight, with their assistance defendant came into possession of a kitchen knife and began chasing Ronnie with the knife, prompting Ronnie's friend Carlos to hit defendant twice in the arm with a ski pole. When someone yelled that the police were coming, the fight ended and Ronnie, Jessica, Mark and their friends drove back to the Urrutia residence.

Sheriff's deputies arrived after the fight was over and spoke with defendant in front of the Sanchez residence. Defendant characterized it as a minor

---

[1] All references are to the Penal Code unless otherwise indicated.

[2] Codefendants Avendano and Lopez were acquitted of all charges.

argument and declined any medical attention or interest in reporting a crime because he was on felony probation and did not want to get into further trouble. He did not appear seriously injured to the officers. One deputy testified recalling seeing a slight bloody residue on his lip, but observed no other injuries, and no swollen or black eye.

*The Homicide on Sunday Morning*

The next morning, Sunday, February 12, 2006, Carlos, his brother Jose, and a friend, Santos, walked past the Sanchez residence on Paso Real looking for Carlos's eyeglasses. They saw defendant, codefendants Avendano and Lopez, and others in the front yard, and heard one of the men, possibly defendant, make threatening remarks as they walked by. A white car was parked in the Sanchez driveway. Carlos and the others kept walking past the house. Carlos then used his cell phone to call Mark, who, together with his friend Ruben, was going to meet up with Carlos and the others on foot. Carlos told Mark not to walk down Paso Real because defendant and his companions had been seen on the street and were looking for him. Carlos agreed they would meet Mark and Ruben on Desire Street, a private street adjacent to Paso Real.

Meanwhile, defendant drove alone to a nearby liquor store to buy cigars. En route he saw Mark, whom he thought was Ronnie. Upon returning to the Sanchez residence, defendant told Avendano and Lopez to get into his car, and the three began driving around looking for "Ronnie."

Carlos and his companions took a shortcut path through the grounds of a nursery as they headed to meet Mark and Ruben on Desire Street. While walking down the path they saw defendant drive past them and turn onto Desire Street. Carlos and his companions ran back down the path. Carlos then tried calling Mark again several times to warn him to avoid Desire Street. He got no answer.

When they emerged from the path, Carlos's group saw defendant's car stopped on Desire Street with all of its doors open. They saw defendant and one of his companions jumping over a fence and heading back to the car. Defendant was holding two bats, or a bat and another long object, which he threw into the car. Defendant and his companions seemed nervous as they jumped into the car and left the scene. Carlos then received a call on his cell phone from Ronnie, who said that his brother Mark was dying.

Ruben testified that despite his and Mark's best efforts to avoid defendant, he, Avendano and Lopez spotted them, sped toward them in the white car as if trying to run them down, then abruptly stopped the car in the middle of the

street, jumped out and began chasing them. Ruben explained that after Mark had received the cell phone call from Carlos, he had retrieved the silver and blue aluminum bat for protection. Ruben heard defendant say, "Come on, let's go, let's get these motherfuckers." Mark and Ruben ran for a chain link fence. Mark jumped the fence first; Ruben tried to jump over it but his hands and sweater got caught on the fence. He managed to roll over the fence and saw Mark, who had kept running. Ruben thought he saw Mark drop his bat as he jumped over the fence. Defendant and his codefendants also jumped over the fence; defendant and Avendano chased Mark while Lopez chased Ruben. Mark was running ahead of Ruben as they split up.

Ruben ran to a nearby shed for cover and soon heard voices nearby, thumping sounds, then running and yelling and car doors slamming as defendant and his companions drove off.

When Ruben and the others found Mark, he was facedown on the ground, bleeding badly with his breathing labored. His front upper teeth were broken off, as if he had been hit hard in the mouth. They saw Mark's "brains hanging out of his head and—he didn't look right," and they could tell he was dying.

An autopsy revealed that Mark sustained at least four blows to the head and three more to other areas of his body. In one area of his head, the force of a blow had shattered his skull into multiple small fragments. The cause of death was blunt force trauma to the head.

No weapons were found in the backyard near where Mark was found lying. Mark's aluminum bat was later recovered from a storm drain a short distance away. DNA analysis of blood samples taken from the bat matched defendant's and Mark's DNA profiles. Defendant's blood was found on the handle of the bat; the victim's blood was found on the barrel or upper portion of the bat.

Christine Lopez was standing outside her home on Honore Street on the Sunday morning in question when she saw a white car carrying three men that she did not know drive by. Christine recalled that the car was moving fast and the men appeared to be laughing or joking loudly. As the car drove past her, she thought she saw the men throw something out of the car against the curb, and she heard a metallic noise. The storm drain from which the bat was recovered is in front of Christine's house. She also heard one of the men say they had "lit him up," or words to that effect. Christine identified defendant and Avendano as two of the three men she had seen in the white car as it drove by.

*Defendant's Testimony*

The defense consisted primarily of defendant testifying in his own behalf. He admitted killing Mark Urrutia with a baseball bat. He claimed that just prior to the murder, he saw Mark and Ruben, mistakenly thought Mark was his brother Ronnie, and drove up to them in order to talk, try to resolve things, and avoid a continuing conflict, since Ronnie was dating defendant's girlfriend's daughter Jessica and defendant and Ronnie were likely to see each other again. Defendant asked Avendano and Lopez to accompany him to talk with Ronnie (i.e., Mark) and Ruben because he did not want the two men "jumping [him]" while he was alone.

Defendant claimed that as he, Avendano and Lopez pulled up to the two men, Mark kicked his car, after which Mark and Ruben jumped over a fence. Defendant testified, "They jumped over the fence and I exited my car, you know, because I was looking to see if there was any damage done to my car. I got kind of upset he kicked my car. So I wanted to see where he was going so that way I could call the police and tell them, you know, this guy kicked my car." Defendant testified he only went over the fence intending "to see where he [Mark] went."

Defense counsel asked defendant on direct examination, "And at some point in time did you catch up with Mark in the field?," to which defendant replied, "Yes." When asked, "And what happens at that point?," defendant gave the following account of events:

"[Defendant] As soon as I approach [Mark] I'm within probably three to four feet of him and he turns around real fast and had kind of like a smirk on his face and [he] said, 'Yeah, now I got you,' and he had a bat in his hands.

"[Counsel] Is that the first time you noticed the bat?

"[Defendant] Yes.

"[Counsel] And what happens at that point?

"[Defendant] He attacked me with the bat.

"[Counsel] And did he hit you again with the bat?

"[Defendant] Yes, he hit me several times.

"[Counsel] And where on your person did you get hit?

"[Defendant] On my left forearm, because I was blocking. I didn't want to get hit in the face. And like on the side of my arms, and then my hands.

"[Counsel] And what happens at that point?

"[Defendant] After a couple like four or five, six swings, he—I grabbed the bat from him, I got the bat from him, and then right when I got it from him, that's when he tried to rush me, like, to attack me.

"[Counsel] And what happens then?

"[Defendant] I hit him with the bat.

"[Counsel] And do you know where you hit him with the bat?

"[Defendant] In his arm. He put his arm up.

"[Counsel] And what happens at that point?

"[Defendant] He still tries to attack me.

"[Counsel] And he keeps coming at you?

"[Defendant] Yeah. Every time he came at me I hit him again with the bat.

"[Counsel] And about how many times total do you think that you hit him?

"[Defendant] Honestly, when he was hitting me I, like, wasn't, like, in the right state of mind. I was worried about getting hit. I didn't want to get beat down and possibly be killed, so I was just worried about getting hit. And then when I got the bat from him, I was worried about getting hit again, because he kept coming at me. So I kept hitting him until he fell.

"[Counsel] And when he fell what happened?

"[Defendant] When he fell I noticed—I didn't hit him anymore but I noticed he was bleeding, and when I seen him bleeding, I got kind of scared.

"[Counsel] And did you run back to the car at that time?

"[Defendant] Yes.

"[Counsel] Did you take the bat with you?

"[Defendant] Yes.

"[Counsel] And when you got back, did you go back over the fence?

"[Defendant] Yes.

"[Counsel] When you got back to the car, were [codefendants] Danny and George there or were they—

"[Defendant] They were standing by the car.

"[Counsel] And what happens at that point?

"[Defendant] We all got back into the car and I threw the bat on the passenger side floor."

Defendant testified he was driving as the three left the scene; that he was "kind of shook up about everything that happened"; and that he threw the bat from the car into a gutter at "the first spot I seen to throw [it]" before dropping off Avendano and Lopez at a friend's house.

### The Trial Court's Ruling

The trial court explained its reasons for refusing the requested instructions on heat of passion voluntary manslaughter in these terms: "I just don't see it as being heat of passion. I see it as a self-defense. But from your own client's mouth he says, 'I want to make peace, I'm not angry, I know everything is fine. I know I'm going to have to deal with this guy because he's hooked up with the female that I'm going to be seeing, I'm going to be around, whether I like it or not. I'm trying to make everything right. The only reason I have my buddies with me is so that if I'm assailed I will not be without recourse.' And the only hint of anger is when he says, 'The guy [Mark] slapped [*sic*] my car.' "

The court explained further, "I'm not trying to be a juror here. But when I say 'viable,' it's not my job to decide exactly in those terms. I don't think that there is substantial or even nontrivial, put it that way, evidence of a reduced degree of culpability based on that [heat of passion] theory. [¶] I just—listening carefully to Mr. Moye's testimony which will provide the only basis for that. He didn't say it. He could have. He didn't. If he had said, 'I became enraged, I became emotional,' et cetera, 'I became hot blooded,' that's what the heat of passion is. He said none of those things. [¶] He said, 'I was defending my life. That's what I was doing. I thought he was going to kill me so I hit him until he stopped moving.' That's self-defense. That's not

heat of passion. [¶] He didn't say, 'I became angry because he hit [*sic*] my car or because he beat me up the night before.' That's not what he did. I'm not saying you can't make reference to those facts and they certainly can play into whether he was reasonable in his belief that he was going to be hurt. And it's also true that the beating of the night before and all those things can play into whether he is honest about his fear. [¶] But they don't get you to heat of passion when he says, 'I don't have any heat of passion. I'm self-defense.' "

The jury convicted defendant of second degree murder, finding that he personally used a deadly weapon (a baseball bat) in the commission of the offense. Defendant appealed, arguing the trial court prejudicially erred by failing to instruct on a sudden quarrel/heat of passion theory of voluntary manslaughter. The Court of Appeal agreed, reversed defendant's murder conviction, and thereafter denied the People's petition for rehearing. We granted the People's petition for review.

## DISCUSSION

### Instructional Error

Defendant argues the voluntary manslaughter instructions the trial court gave were incomplete because they did not include instruction on sudden quarrel/heat of passion despite support for that theory of manslaughter in the evidence. The trial court instructed the jury on voluntary manslaughter in connection with imperfect or unreasonable self-defense, but found insubstantial evidence to further instruct on sudden quarrel/heat of passion as requested by the defense. The People, in contrast, urge that the trial court's rejection of heat of passion instructions was proper given the state of the evidence at the close of the evidentiary phase. Assuming arguendo it was error to refuse such instructions, the People argue further such error was nonprejudicial under the applicable *Watson* harmless error test.

■ "In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Breverman*[, *supra*,] 19 Cal.4th [at p.] 154 . . . .) This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. (*Ibid.*) The trial court must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given. (*Ibid.*; see also *People v. Barton* (1995) 12 Cal.4th 186, 196, 199–203 [47 Cal.Rptr.2d 569, 906 P.2d 531] [trial court must instruct on heat-of-passion and unreasonable self-defense theories of manslaughter, if supported by evidence, even when defendant objects on the basis

that such instructions would conflict with his defense].)" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

■ " 'Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)' (*People* v. *Barton*[, *supra*,] 12 Cal.4th 186, 199 . . . (*Barton*).) Generally, the intent to unlawfully kill constitutes malice. (§ 188; *People* v. *Saille* (1991) 54 Cal.3d 1103, 1113 [2 Cal.Rptr.2d 364, 820 P.2d 588]; see *In re Christian S.* (1994) 7 Cal.4th 768, 778–780 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*).) 'But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense (see []*Christian S.*[, *supra*,] 7 Cal.4th 768; [*People v. *]*Flannel*[ (1979)] 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]).' (*Barton, supra,* 12 Cal.4th at p. 199.) Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide (*ibid.*), voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder (*id.* at pp. 201–202)." (*Breverman, supra,* 19 Cal.4th at pp. 153–154.)

"[N]either heat of passion nor imperfect self-defense is an element of voluntary manslaughter" that must be affirmatively proven. (*People v. Rios* (2000) 23 Cal.4th 450, 454 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) Rather, they are "theories of partial exculpation" that reduce murder to manslaughter by negating the element of malice. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016 [75 Cal.Rptr.2d 626].)

■ A heat of passion theory of manslaughter has both an objective and a subjective component. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 [36 Cal.Rptr.3d 340, 123 P.3d 614]; *People v. Steele* (2002) 27 Cal.4th 1230, 1252 [120 Cal.Rptr.2d 432, 47 P.3d 225] (*Steele*); *People v. Wickersham* (1982) 32 Cal.3d 307, 326–327 [185 Cal.Rptr. 436, 650 P.2d 311] (*Wickersham*).)

■ " 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' (*People v. Wickersham, supra,* 32 Cal.3d at p. 326.)" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [124 Cal.Rptr.2d 373, 52 P.3d 572].) "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must

be caused by the victim (see *In re Thomas C.* (1986) 183 Cal.App.3d 786, 798 [228 Cal.Rptr. 430]), or be conduct reasonably believed by the defendant to have been engaged in by the victim. (See *People* v. *Brooks* (1986) 185 Cal.App.3d 687, 694 [230 Cal.Rptr. 86]; see also 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 512, p. 579.) The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]; *People* v. *Valentine* (1946) 28 Cal.2d 121, 138–139 [169 P.2d 1].)" (*People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001] (*Lee*).)

To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation. (*Wickersham, supra*, 32 Cal.3d at p. 327.) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton, supra*, 12 Cal.4th at p. 201.) " 'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . .' (*Wickersham, supra*, 32 Cal.3d at p. 327.)" (*Breverman, supra*, 19 Cal.4th at p. 163.)

■ The jury in this case was instructed both on justifiable homicide based on reasonable self-defense, which is a complete defense to murder, and on manslaughter based on unreasonable or imperfect self-defense, which reduces murder to voluntary manslaughter. (*Breverman, supra*, 19 Cal.4th at pp. 153–154.) At the close of evidence, the defense also requested an instruction on sudden quarrel/heat of passion voluntary manslaughter. The trial court refused to give the instruction, explaining, "If there is evidence—̇ sufficient, nontrivial evidence of heat of passion provoked by the victim in such a way that a reasonable person would be thrown into a killing rage, you have a voluntary manslaughter. I understand that [theory]. I just don't believe it's been shown here."

The trial court went on to explain why it would also not be giving an instruction on the "cooling-off period" that can negate a heat of passion voluntary manslaughter defense. The court pointed out that defendant himself had testified he was only looking for Ronnie that morning to "make peace" because Ronnie was the boyfriend of Jessica, defendant's girlfriend's daughter (defendant testified he mistakenly thought Mark was Ronnie when he

encountered Mark on the street). The court also saw no evidence of anger or passion in defendant spilling over from the fight the previous evening into the next day. The trial court did make clear in its ruling, however, that the impact of the previous evening's fight on defendant's state of mind the following morning was relevant on the question whether he reasonably or unreasonably believed in the need to defend himself against Mark, and thus on the ultimate question whether he harbored malice.

Defense counsel argued an instruction on sudden quarrel/heat of passion manslaughter was required in light of defendant's testimony that Mark kicked his car when defendant and his companions confronted Mark and Ruben on the street. Counsel argued, "Just imagine the affront when . . . [w]hen you are going there to make peace and before you have an opportunity to do so the person attacks your vehicle." When counsel next suggested defendant's car could be considered just an extension of himself, the court remarked, "I'm going to save you the embarrassment of making that argument. We're smiling at one another, the record should reflect. We're both semi serious here. At least I am. I don't see the facts, but again I'll give you every opportunity to convince me."

We agree with the People that evidence of the fight on Saturday evening in which Mark and defendant were both involved did not itself constitute legally sufficient provocation to require instruction on sudden quarrel/heat of passion voluntary manslaughter in connection with the killing of Mark the following day. Defendant himself testified that by Sunday morning he had "cooled off" and was no longer upset about the previous evening's fight. (See *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1551–1552 [38 Cal.Rptr.2d 859].) Both the trial court and Court of Appeal recognized that the evidence of the fight on the previous evening, standing alone, would not constitute sufficient legal provocation to support a heat of passion defense.

We further agree with the People that the victim's asserted act of kicking defendant's car on Sunday morning just before defendant and his codefendants gave chase likewise did not itself constitute legally sufficient provocation to cause an ordinarily reasonable person to act out of a heat of passion and kill Mark in response. (*In re Christian S., supra,* 7 Cal.4th at p. 779, fn. 3; *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [41 Cal.Rptr.3d 244].) Indeed, defendant himself testified Mark's conduct at most aroused in him a desire to report the car-kicking incident to the police; he testified he chased Mark over the fence only to "see where he went" so he could relate that information to the police. Here too, both the trial court and the Court of Appeal recognized that the alleged car-kicking incident, if viewed in isolation, would not constitute sufficient legal provocation to support a heat of passion defense.

In short, neither the fight on the previous night, nor the car-kicking incident on Sunday morning shortly before the homicide, themselves constituted sufficient legal provocation without the necessary cooling-off period to warrant a heat of passion instruction. Both courts also agreed that nothing in the record, including defendant's own narrative of events leading up to the homicide, suggested he was actually, subjectively, under the influence of a "strong passion" resulting from either of those occurrences when he killed Mark. (*Wickersham, supra,* 32 Cal.3d at p. 327.)[3]

The Court of Appeal's determination that a heat of passion instruction was required in this case turned *solely* on what assertedly occurred when, according to defendant, he caught up with Mark after chasing him over the fence and through a field and Mark turned and "attacked" him. Ruben, who had split up from Mark and testified he was himself being chased by one of the codefendants, was not a percipient witness to the fatal altercation. Defendant himself was the only living eyewitness to his final encounter with the victim.

According to defendant, when he caught up to Mark and first noticed Mark was holding a bat, Mark turned, and with a smirk on his face stated, "Yeah, now I got you," as he attacked defendant with the bat, hitting him on his arms and hands as defendant sought to defend himself and avoid being hit in the face. After four or five swings, defendant managed to grab the bat from Mark. At that point Mark rushed at defendant, so defendant hit him with the bat, striking him on his arm. Mark came at him again; according to defendant, each time he did so, defendant hit him again in self-defense. True, defendant did at one point in his testimony state he was not "in the right state of mind." But he immediately explained what he meant by that statement—he was worried about getting hit by Mark because he did not want to "get beat down and possibly be killed." Holding the bat with two hands, defendant met each advance by Mark with a defensive swing of the bat until the victim fell to the ground and could attack him no longer.

The Court of Appeal nonetheless concluded on this record that defendant's testimony, together with the events that transpired after defendant chased and caught Mark and Mark turned and attacked him, required the giving of an instruction on sudden quarrel/heat of passion voluntary manslaughter. The court reasoned, "Nevertheless, the final incident with Mark wielding the bat, could qualify as adequate provocation. . . . [S]ufficient provocation may be verbal or physical. According to [defendant's] testimony [the] victim turned to [him] with bat in hand and said, 'Yeah, now I've got you.' The victim's

---

[3] Indeed, defendant testified that at the time he first encountered Mark and Ruben on Sunday morning, he had the calm presence of mind to be driving slowly in a school zone in case school was in session (it was a Sunday).

demeanor and words along with the fact that he was carrying a bat and attacked [defendant] with the bat is sufficiently provocative to cause an ordinary person of average disposition to act rashly and without due deliberation or reflection. Regarding whether the subjective element was satisfied, [defendant] testified, 'I was defending my life. That's what I was doing. I thought he was going to kill me so I hit him until he stopped moving.' [Defendant's] testimony shows he was mainly concerned with defending himself. 'I didn't want to get beat down and possibly killed, so I was just worried about getting hit. And then when I got the bat from him, I was worried about getting hit again, because he kept coming at me. So I kept hitting him until he fell.' *If believed, it is evident that [defendant] was in fear for his life at the time he was hitting Mark with the bat.*" (Italics added.)

We cannot agree with the Court of Appeal's conclusion that instruction on a sudden quarrel/heat of passion theory of voluntary manslaughter was required on the facts of this case. As the trial court correctly concluded, substantial evidence that defendant acted while under "the actual influence of a strong passion" (*Wickersham, supra,* 32 Cal.3d at p. 327) in response to legally sufficient provocation, such as caused him to " 'act rashly or without due deliberation and reflection, and from this passion rather than from judgment' " (*id.* at p. 326) was lacking in this case.

■ "As our prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. (*Flannel, supra,* 25 Cal.3d 668, 684, fn. 12, original italics; see also *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People v. Ramos* (1982) 30 Cal.3d 553, 582 [180 Cal.Rptr. 266, 639 P.2d 908].) 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. (*Flannel, supra,* at p. 684, quoting *People v. Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]; accord, *Barton, supra,* 12 Cal.4th 186, 201, fn. 8 ['evidence that a reasonable jury could find persuasive'].)" (*Breverman, supra,* 19 Cal.4th at p. 162.)

In the face of defendant's own testimony, no reasonable juror could conclude defendant acted " ' "rashly or without due deliberation and reflection, and from this passion rather than from judgment . . ." ' [citations]" (*Breverman, supra,* 19 Cal.4th at p. 163) when, according to defendant, he responded to Mark's attack with the baseball bat by grabbing the bat from him and using it to defend himself from Mark's continuing advances. The thrust of defendant's testimony, in every particular, was that he approached

Mark and Ruben with peaceful intentions, thinking Mark was his brother Ronnie, intending to talk things out and resolve any lingering hostility that might have carried over from the previous evening's altercation. Although defendant did testify he was not in a "right state of mind" when Mark thereafter turned and attacked him after the chase, he immediately explained he was referring to his thought processes being caught up in the effort to defend himself from Mark. Defendant took great pains in his testimony to justify each blow he landed on Mark with the bat as a direct, defensive response to successive advances by Mark during his attack on defendant. Defendant testified, "Every time he came at me I hit him again with the bat."

In short, the thrust of defendant's testimony below was self-defense—both reasonable self-defense (a complete defense to the criminal charges), and unreasonable or imperfect self-defense (a partial defense that reduces murder to manslaughter). There was insubstantial evidence at the close of the evidentiary phase to establish that defendant "actually, subjectively, kill[ed] under the heat of passion." (*Steele, supra*, 27 Cal.4th at p. 1252; see *Wickersham, supra*, 32 Cal.3d at pp. 326–327.) The only testimonial evidence on the point, substantial or otherwise, came from defendant himself given his decision to take the stand and testify in his own defense. His only claim was that he acted out of self-defense in using the bat to thwart Mark's continuing advances. He provided a blow-by-blow recounting of events in which he characterized every swing he took with the bat as a defensive response to each of Mark's successive advances.

█ A trial court has a duty to instruct on general principles of law that are "closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) But no principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter, and the evidence actually introduced on the point—the defendant's own testimony—was to the contrary.

Nothing in this court's decision in *Breverman, supra*, 19 Cal.4th 142, warrants a different conclusion. The facts of *Breverman* are distinguishable from those here before us. In that case, an angry group of at least a dozen men "taunted [the] defendant, then used a baseball bat and other implements to batter his automobile, which was parked in the driveway near his front door. Defendant fired several shots through a window pane in the front door, then came outside and fired further shots toward the fleeing vandals. One bullet from this second volley fatally wounded a member of the group." (*Id.* at p. 148.) We concluded on those facts that it was error not to give instructions

on *both* heat of passion and unreasonable self-defense theories of manslaughter. With regard to heat of passion, we explained, "there was evidence that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon domestic property occupied by [the] defendant and acted in a menacing manner. This intimidating conduct included challenges to the defendant to fight, followed by use of the weapons to batter and smash defendant's vehicle parked in the driveway of his residence, within a short distance from the front door. Defendant and the other persons in the house all indicated that the number and behavior of the intruders, which defendant characterized as a 'mob,' caused immediate fear and panic. Under these circumstances, a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition." (*Id.* at pp. 163–164, fn. omitted.)

Nothing in *Breverman* suggests an instruction on heat of passion is required in every case in which the *only* evidence of unreasonable self-defense is the circumstance that a defendant is attacked and consequently fears for his life. In *Breverman* there was affirmative evidence that the defendant panicked in the face of an attack on his car and home by a mob of angry men and had come out shooting, and continued shooting, even after the group had turned and ran. "At one point in his police statement, defendant suggested that he acted in one continuous, *chaotic response* to the riotous events outside his door." (*Breverman, supra*, 19 Cal.4th at p. 164, italics added, fn. omitted.) Here, in contrast, defendant testified he acted deliberately in seeking to defend himself from each successive advance by the victim who, defendant claimed, turned and attacked him once defendant chased him down and cornered him. With regard to evidence of the actor's state of mind bearing on the question of malice, the facts of *Breverman* and this case are inapposite.

■ "[N]o fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely." (*People v. Holloway* (2004) 33 Cal.4th 96, 141 [14 Cal.Rptr.3d 212, 91 P.3d 164].)

### Prejudice

Assuming arguendo that it was error for the trial court to fail to instruct the jury on a heat of passion theory of voluntary manslaughter in addition to the instructions that were given on imperfect self-defense manslaughter, the People urge us to find such error harmless under the *Watson* test (*Watson, supra*, 46 Cal.2d at p. 836), made applicable to instructional errors of this sort in California trials by *Breverman, supra*, 19 Cal.4th at pages 177–178. We

agree that even if it was error to fail to instruct on heat of passion voluntary manslaughter on this record, any such error was harmless as it is not reasonably probable defendant would have obtained a more favorable outcome had the jury been so instructed. (*Id.* at p. 178.)

As was explained in *Breverman, supra,* 19 Cal.4th 142, "the sua sponte duty to instruct on a lesser included offense arises if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense. (*Flannel, supra,* 25 Cal.3d 668, 684–685.) This standard requires instructions on a lesser included offense whenever ' "a jury composed of reasonable [persons] *could . . . conclude*[]" ' that the lesser, but not the greater, offense was committed. (*Id.* at p. 684, italics added, quoting *People* v. *Carr, supra,* 8 Cal.3d 287, 294.) In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight. (See *Flannel, supra,* 25 Cal.3d 668, 684; see also *Wickersham, supra,* 32 Cal.3d 307, 324.)

"Appellate review under *Watson,* on the other hand, takes an entirely different view of the evidence. Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. Accordingly, a determination that a duty arose to give instructions on a lesser included offense, and that the omission of such instructions in whole or in part was error, does not resolve the question whether the error was prejudicial. Application of the *Watson* standard of appellate review may disclose that, though error occurred, it was harmless." (*Breverman, supra,* 19 Cal.4th at pp. 177–178, fn. omitted.)

In employing the *Watson* standard of review here, it is reasonable to assume the jury considered all of the defense evidence bearing on defendant's state of mind and the question whether he harbored malice when it entertained *and rejected* his claims of reasonable and unreasonable (or imperfect) self-defense. Ruben testified that despite his and Mark's best efforts to avoid defendant, defendant spotted them, sped toward them as if trying to run them down, then abruptly stopped the car and jumped out, along with Avendano and Lopez, leaving the vehicle in the middle of the street with its doors open, as they began chasing the two. Ruben testified he heard defendant say, "Come on, let's go, let's get these motherfuckers." Mark and Ruben quickly scaled a chain link fence. Ruben testified he thought he saw Mark drop his bat at the beginning of the chase as he was going over the fence. Defendant

immediately followed Mark over the fence and chased him a considerable distance before cornering him in a field or large backyard.

Ruben and Mark became separated during the chase. When Ruben heard defendant and the others leaving the area he looked for Mark and found him facedown on the ground, bleeding badly, with his breathing labored. His front upper teeth were broken off, as if he had been hit hard in the mouth, and his "brains [were] hanging out of his head." An autopsy revealed that Mark sustained at least four blows to the head and three more to other areas of his body. In one area of his head, the force of a blow was so strong it shattered his skull into multiple small fragments. Moments after fleeing the crime scene, defendant had enough sense and composure to dispose of the bloodied murder weapon in a nearby storm drain.

Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense. To the contrary, the evidence established beyond a reasonable doubt that defendant located the victim and Ruben the morning after the fistfight, enlisted the assistance of Avendano and Lopez, chased the victim over a chain link fence and through a field, caught him and bludgeoned him to death with a baseball bat, after which defendant disposed of the bloodied murder weapon in a nearby storm drain. Defendant's claim—that the victim kicked his car before trying to run for safety, and that he only chased the victim to "see where he was going" so he could report the alleged car-kicking incident to the police[4]—was ultimately rejected by the jury when it considered such evidence and found that he had killed with malice.

Moreover, the jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter.

Upon examining the entire cause, including the evidence (Cal. Const., art. VI, § 13), we conclude it is not "reasonably probable" defendant would

---

[4] Once defendant elected to take the stand, the jury learned he had been convicted of assault with a firearm in 2004 and was on felony probation for that offense at the time he committed this homicide.

have obtained a more favorable outcome at trial had a heat of passion instruction been given. (*Watson, supra,* 46 Cal.2d at p. 836.)[5]

### CONCLUSION

The judgment of the Court of Appeal is reversed and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur in the judgment on the ground that any error in refusing to instruct on heat-of-passion voluntary manslaughter was, on the particular facts of this case, harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. As the majority explains, the jurors, disbelieving defendant's testimony to the extent of rejecting his claims of reasonable and unreasonable self-defense, were not reasonably likely to accept that same testimony as showing defendant killed Mark Urrutia in a heat of passion provoked by Urrutia's attack on him. (Maj. opn., *ante,* at pp. 555–557.)

I write separately because I believe the question whether the record contains substantial evidence justifying the requested instruction is closer than the majority allows. Defendant's testimony that Urrutia attacked him with a baseball bat, hitting him several times, and that defendant "wasn't, like, in the right state of mind" as he wrested the bat from Urrutia and struck the fatal blows, arguably would have permitted a rational juror to find defendant killed "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) This is so even though, as the majority stresses, the thrust of defendant's testimony was to show he acted in self-defense, rationally responding to the victim's attack. As we explained in *People v. Barton* (1995) 12 Cal.4th 186 [47 Cal.Rptr.2d 569, 906 P.2d 531], instructions on voluntary manslaughter should be given when supported by substantial evidence, notwithstanding the defendant's "protestations of innocence" (*id.* at p. 196). "The trial court must instruct on lesser included offenses when there is substantial evidence to support the instruction, regardless of the theories of

---

[5] Justice Kennard disagrees with the prejudice test mandated by our state Constitution and found applicable to this category of instructional error by a majority of this court in *Breverman, supra,* 19 Cal.4th at pages 142, 178. (Dis. opn. of Kennard, J., *post,* at pp. 563–565.) As in *Breverman,* defendant has not raised the claim advanced by Justice Kennard—that the lesser included offense instructions given below were defective under federal law because they incompletely defined the malice element of murder, requiring application of the prejudice test for federal constitutional errors set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Breverman,* at p. 170, fn. 19.) Accordingly, the claim must properly await a case in which it has been clearly raised and fully briefed. (*Ibid.*)

the case proffered by the parties." (*Id.* at p. 203.) Nor did the trial court's instruction on the unreasonable self-defense theory of voluntary manslaughter excuse it from instructing on heat of passion as well if the evidence supported both theories. (*People v. Breverman* (1998) 19 Cal.4th 142, 162. [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Although not as strong as in *People v. Breverman, supra,* 19 Cal.4th at pages 163–164, or *People v. Barton, supra,* 12 Cal.4th at page 202, there was in this case evidence of heat of passion. Defendant testified to a sudden attack by the victim that put him in an excited state—not "in [his] right state of mind"—leading to a struggle that ended in the victim's death. As the failure to give the requested instruction was clearly harmless, unlike the majority I . would not decide the difficult question of whether this testimony constitutes *substantial* evidence defendant killed in a heat of passion.

**KENNARD, J.,** Dissenting.—In a murder case, when there is substantial evidence that the killing occurred "upon a sudden quarrel or heat of passion" (Pen. Code, § 192, subd. (a)), or that the killing resulted from the defendant's unreasonable belief that self-defense was necessary (*People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970]; *People v. Flannel* (1979) 25 Cal.3d 668, 680–683 [160 Cal.Rptr. 84, 603 P.2d 1]), the trial court must instruct the jury on voluntary manslaughter, which is a lesser offense of murder. Here, the trial court instructed the jury on the latter theory, but it refused the defense request to instruct on the former theory. In upholding that ruling, the majority describes as "insubstantial" (maj. opn., *ante,* at p. 540) the evidence tending to show that the killing occurred in the heat of passion. I disagree.

## I

Defendant and his girlfriend Kandie Sanchez lived in the home of Kandie's mother in Rowland Heights, an unincorporated community in Los Angeles County. Also living there was Kandie's 20-year-old daughter, Jessica Sanchez.

On the night of February 11, 2006, Kandie's mother and daughter quarreled with defendant; they wanted him to move out. After saying that her boyfriend could "kick [defendant's] ass," Jessica called her boyfriend, Ronnie Urrutia, and asked him to come over.

At the time, Ronnie Urrutia was at a party in Fontana with his brother Mark (the victim) and three friends (Carlos Munoz, Ruben Ibarra, and a man named Rudy, whose last name does not appear in the record). All five had been drinking. After Jessica's call, they went to the Sanchez home, where

they encountered defendant and codefendants Daniel Avendano and Jorge Lopez. A fistfight ensued between defendant and Ronnie. The two struggled on the ground. When defendant got on top of Ronnie, the latter's friends Munoz and Ibarra kicked defendant, and Mark hit defendant twice in the back with a baseball bat while Ronnie held defendant down. Ibarra, who was intoxicated, threw a bottle at defendant. After the fight ended, defendant, who was still angry, chased Ronnie with a kitchen knife as Ronnie and Jessica were leaving; to protect Ronnie, Munoz hit defendant in the arm with a broken ski pole.

The next day, Carlos Munoz discovered that he had lost his glasses during the fight. He then walked over to the Sanchez house to look for them. With him were his brother Jose and a friend, Santos Buenrostros. They saw defendant, Avendano, and Lopez, and heard them talk: One asked if the three men (Carlos, Jose, and Buenrostros) were "them" (presumably referring to Mark and his brother Ronnie); another replied, "that's not them," to which the first responded, "Oh, good, because if it was I was about to do something." Defendant, Avendano, and Lopez got into a white car and drove off. Carlos called Mark, who was with his friend Ruben Ibarra, and warned him that defendant and his friends were looking for Mark. Mark suggested meeting a couple of blocks away.

As Mark and Ibarra were on their way, Ibarra saw a white car driving fast towards them. The car stopped abruptly and out came defendant, Avendano, and Lopez. Ibarra heard defendant say, "Come on, . . . let's get these motherfuckers." Ibarra and Mark, who was carrying a baseball bat, climbed a fence and split up. While defendant and Avendano chased Mark, Lopez pursued Ibarra, who ran to a shed. When the coast was clear, Ibarra found Mark lying 100 yards from the fence, with serious head injuries.

About that time, Carlos, Jose, and Buenrostros came upon defendant's white car, which was parked with all its doors open. Moments later, defendant, Avendano, and Lopez were seen jumping over a fence. They looked nervous. Defendant was carrying two baseball bats, which he put in the trunk of the car. Defendant and his two companions then drove off. Later that morning, Christine Lopez was in front of her home, not far from the scene of the killing, when she saw a white car carrying three men she did not know; the men were laughing loudly. She saw them throw something out of the car. One of the men said they had "lit him up" or "lighted up." At trial, she identified two of the men as defendant and Avendano. Police recovered Mark's baseball bat in a storm drain near the area where Christine Lopez had seen the men in the white car. Bloodstains on the handle of the bat matched defendant's DNA profile, while bloodstains on the barrel matched Mark's DNA profile.

Mark died of his injuries. He sustained at least four blows to the head and three to the rest of his body. There were wounds on his hands that could have been defensive wounds, but also might have resulted from climbing the fence.

According to Kandie Sanchez, after the killing defendant returned to the Sanchez home, looking "all upset"; he quickly departed, leaving his belongings behind. She did not see him again until she testified at defendant's trial. Defendant was arrested three weeks after he killed Mark.

Defendant testified that on the day of the killing he was driving to a store when he saw a man whom he believed to be Ronnie Urrutia (the boyfriend of his girlfriend's daughter) walking down the street with another man. Defendant decided to talk to Ronnie about the previous night's fight, and he asked Avendano and Lopez to go with him for protection. As they were driving down the street, defendant saw Mark (Ronnie's brother) with Ibarra. When defendant stopped to talk to them, Mark kicked defendant's car, after which Mark and Ibarra fled over a fence. Upset that Mark had kicked his car, defendant chased Mark, catching up to him in a field. When defendant was about four feet away, Mark turned and said, "yeah, now I got you." Mark then attacked defendant with a baseball bat, hitting defendant's arms and hands, which defendant used to protect his face. After Mark swung the bat four or five times, defendant managed to take it away. Mark continued to come towards defendant, who then hit Mark's arm with the baseball bat. Mark "still trie[d] to attack" defendant, who, fearing that Mark would grab the bat back and injure him, kept hitting Mark until he fell. At this point defendant got scared and ran off, carrying the baseball bat with him. Later, he threw the bat in the gutter.

## II

A defendant who unlawfully kills "upon a sudden quarrel or heat of passion" (Pen. Code, § 192, subd. (a)) lacks malice, and is therefore guilty not of murder but of the lesser offense of voluntary manslaughter. "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*).)

"Heat of passion" will reduce murder to voluntary manslaughter only if there is adequate provocation. The victim's conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to

act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001].)

A trial court must instruct the jury on voluntary manslaughter arising from a sudden quarrel or heat of passion when there is evidence from which a jury of reasonable persons could conclude that the lesser offense of voluntary manslaughter, but not the greater offense of murder, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*).) Any doubts on the sufficiency of the evidence to warrant an instruction on voluntary manslaughter should be resolved in the defendant's favor. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944 [90 Cal.Rptr.2d 143, 987 P.2d 168]; *People v. Flannel, supra*, 25 Cal.3d at p. 685.)

Here, defendant contends that the following three acts by victim Mark Urrutia constituted provocation that "would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" (*People v. Lee, supra*, 20 Cal.4th at p. 59): (1) The night before the killing, Mark hit defendant with a baseball bat; (2) shortly before the killing, Mark (according to defendant) angered defendant by kicking his car; (3) immediately before the killing, Mark (according to defendant) hit defendant with a baseball bat.

The majority holds that neither the first nor the second of these three acts by the victim furnished the requisite provocation. The majority points out that there was a long "cooling-off" period after the first act (hitting defendant with the baseball bat the night before the killing), and that the second act (kicking defendant's car on the day of the killing) was not sufficiently provocative to cause an ordinary person to act without due deliberation or reflection. (Maj. opn., *ante*, at pp. 551–552.) I agree.

The majority does not, however, decide whether the third act (hitting defendant with the baseball bat just before the killing) constituted adequate provocation. It concludes that even if it was, there was no substantial evidence that defendant acted "rashly or without due deliberation and reflection" (*People v. Lee, supra*, 20 Cal.4th at p. 59) when he killed Mark, and therefore the trial court was not required to instruct the jury on voluntary manslaughter arising from a "sudden quarrel or heat of passion" (Pen. Code, § 192, subd. (a)). I disagree.

True, there was no *direct evidence* that defendant was acting in the heat of passion when he hit Mark with the baseball bat: Defendant told the jury that he had killed Mark in self-defense, apparently in an attempt to gain a verdict of not guilty. But as explained below, there was *circumstantial evidence* that defendant acted in the heat of passion. The jury should not have to choose

between believing defendant's self-serving testimony that he acted in self-defense—and therefore should not be found guilty—and accepting the prosecution's argument that the killing was murder. " 'Our courts are not gambling halls but forums for the discovery of truth.' [Citation.] Truth may lie neither with the defendant's protestations of innocence nor with the prosecution's assertion that the defendant is guilty of the offense charged, but at a point between these two extremes: the evidence may show that the defendant is guilty of some intermediate offense included within, but lesser than, the crime charged. A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense would impair the jury's truth-ascertainment function." (*Barton, supra,* 12 Cal.4th at p. 196.)

Here, there was substantial circumstantial evidence from which the jury could have reasonably concluded that defendant killed Mark in a sudden quarrel or in the heat of passion. There was evidence that when Mark hit defendant with a baseball bat the night before the killing, defendant became so angry that he chased Mark's brother Ronnie—who had been in a fight with defendant when Mark hit defendant with the bat—with a kitchen knife. There was also evidence that defendant again became upset when Mark, according to defendant, kicked defendant's car shortly before the killing. From this evidence the jury could have reasonably inferred that just before the killing defendant again became enraged when, according to defendant, Mark—as he had done the night before—hit defendant with a baseball bat. Therefore, the trial court erred when it refused to instruct the jury on voluntary manslaughter arising from a sudden quarrel or heat of passion.

I turn now to the complex question of whether this instructional error was prejudicial.

### III

In *Breverman,* this court held that "the trial court erred . . . when it failed to instruct . . . on heat of passion as a theory of voluntary manslaughter." (*Breverman, supra,* 19 Cal.4th at p. 164.) To assess prejudice, the *Breverman* majority fashioned this general rule: When a trial court fails to instruct the jury on "all lesser included offenses and theories thereof which are supported by the evidence" (*id.* at p. 178), the error is a violation of state law, not the federal Constitution (*id.* at p. 165), and is prejudicial only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

I disagreed with that prejudice test. My dissenting opinion in *Breverman* explained: "Given the manner in which California has structured the relationship between murder and voluntary manslaughter, the complete definition of

malice is the intent to kill or the intent to do a dangerous act with conscious disregard of its danger *plus the absence of* both heat of passion and unreasonable self-defense. Where . . . there is sufficient evidence of heat of passion to support a voluntary manslaughter verdict, murder instructions that fail to inform the jury it may not find the defendant guilty of murder if heat of passion is present are incomplete instructions on the element of malice." (*Breverman, supra,* 19 Cal.4th at pp. 189–190 (dis. opn. of Kennard, J.).) Such a failure to instruct, I concluded, is "federal constitutional error" (*id.* at p. 194 (dis. opn. of Kennard, J.)), because it gives the jury an incomplete definition of malice, which is an element of the charged crime of murder.

The *Breverman* majority saw no need to respond to my dissent because, according to the majority, the theory underlying my dissenting opinion had not been raised by the defendant either in the Court of Appeal or in this court. (*Breverman, supra,* 19 Cal.4th at p. 170, fn. 19.) I was of the view that the defendant had preserved the issue. (*Id.* at pp. 191–194 (dis. opn. of Kennard, J.).)

This court has yet to resolve the issue I raised in my dissenting opinion in *Breverman.* (See *People v. Lasko* (2000) 23 Cal.4th 101, 113 [96 Cal.Rptr.2d 441, 999 P.2d 666] [explaining that *Breverman* did not decide the question].)

Here, defendant's argument on prejudice is premised on the applicability of the *Watson* harmless-error standard, which applies to state law violations. Applying that test, the majority concludes that "even if it was error to fail to instruct on heat of passion voluntary manslaughter on this record, any such error was harmless as it is not reasonably probable defendant would have obtained a more favorable outcome had the jury been so instructed." (Maj. opn., *ante,* at p. 556.) In my view, however, the trial court's failure to instruct on the heat of passion theory of voluntary manslaughter was federal constitutional error "because the trial court . . . inadequately instructed the jury on the elements of murder by failing to explain that the element of malice is not present when the defendant kills in the heat of passion." (*People v. Lasko, supra,* 23 Cal.4th at p. 113.)[1]

When an instruction violates the federal Constitution, prejudice is measured by whether the prosecution can show beyond a reasonable doubt that the error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17

[1] I reach this conclusion notwithstanding defendant's failure to argue in this court that the trial court's instructional error violated the federal Constitution. (See maj. opn., *ante,* at p. 558, fn. 5 [noting that defendant has not raised the issue]; *People v. Williams* (1998) 17 Cal.4th 148, 162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429] ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party. . . . Whether or not it should do so is entrusted to its discretion."].)

L.Ed.2d 705, 87 S.Ct. 824].) Under that test, a reviewing court "asks whether the record contains evidence that could rationally lead to a contrary finding" by the jury. (*Neder v. United States* (1999) 527 U.S. 1, 19 [144 L.Ed.2d 35, 119 S.Ct. 1827].) Here, as I have explained, the record contains substantial evidence that defendant was acting in the heat of passion when he killed Mark Urrutia. Based on that evidence, the jury could have rationally concluded that defendant lacked malice and was guilty not of murder but of the lesser offense of voluntary manslaughter.

I would affirm the Court of Appeal's judgment, which had reversed defendant's murder conviction.