Filed 3/24/14  P. v. Munsel CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JENNA ROSE MUNSEL,<br><br>Defendant and Appellant. | F065952<br><br>(Super. Ct. No. CRF37510)<br><br>**OPINION** |

### <u>THE COURT</u>*

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Cornell, Acting P.J., Gomes, J., and Franson, J.

# INTRODUCTION

On February 15, 2012, a first amended felony complaint was filed against appellant, Jenna Rose Munsel, charging her with felony vandalism (Pen. Code, § 594, subd. (b)(1), count I)[1] and two counts of felony corporal injury to a cohabitant (§ 273.5, subd. (a), counts II & III). At the conclusion of the preliminary hearing on February 15, 2012, Munsel was held to answer on the allegations and the complaint was deemed to be an information.

At the conclusion of a jury trial on July 27, 2012, Munsel was found guilty of all three allegations. The jury, however, found the vandalism allegation in count I was a misdemeanor rather than a felony.

On September 28, 2012, the trial court denied appellant's motions for a new trial and to have counts II and III reduced to misdemeanors. The court suspended imposition of sentence, placed Munsel on probation for five years, and ordered her to serve 90 days in jail. Munsel contends the trial court failed to instruct the jury in counts II and III on the lesser included offense of misdemeanor battery of a cohabitant and that the error requires reversal of her conviction. We agree.

## FACTS

### *The December 2, 2011 Incident*

Munsel and William Fye had been dating since May 2011, and were living together. On December 2, 2011, a windstorm had knocked out the power in Tuolumne City. Jimmy Frazel and his wife were barbequing at their home with Munsel and Fye as guests. It was dark outside. The only light was a fire burning in Frazel's barbeque. Frazel had a prescription for what he called "bad" vision but was not wearing his glasses.

---

[1]     Unless otherwise noted, all statutory references are to the Penal Code.

According to Frazel, everyone, including Munsel, was drinking beers and shots of Vodka.  Fye was also taking pain medication and muscle relaxants.  Munsel was inside the house with Frazel's wife.  Frazel and Fye were outside.  Munsel came outside, handed Fye his phone, and the two started fighting.  Frazel said that after Munsel handed Fye his phone, "some swings was [sic] thrown and other stuff was flying, a chair.  But that was about it, and then we went to his [Fye's] house afterwards."

Elaborating on his initial statement, Frazel said Munsel punched Fye.  When asked how many times Munsel punched Fye, Frazel replied, "I don't know, two, three times or so, something like that."  Frazel could not remember where Munsel punched Fye because it "happened fast."  Frazel did not see Fye assault Munsel.

Munsel then picked up a stacking-type school desk chair from Frazel's porch.  The chair had a metal frame underneath and metal legs.  The seat and back of the chair were plastic.  According to Frazel, Munsel did not swing at Fye by coming down on him with the chair.  Frazel explained that Munsel was not trying to kill Fye with the chair.  Frazel described Munsel as swinging the chair from left to right across her chest.  Frazel also described the chair, and other "stuff," as "flying."  Frazel was not sure where the chair hit Fye, but later saw a knot on the back of Fye's head.  Munsel went to her truck, argued verbally with Fye, and left.

Robert Gomez was Fye's neighbor.  Late on the evening of December 2, 2011, he heard stuff falling over and glass breaking in the backyard of the apartment complex.  Gomez saw Munsel's truck parked in front of Fye's place.  He then saw her exit the backyard and leave.

Fye testified that he was in love with Munsel and they were living together when the incident happened.  According to Fye, the power had been off for a week and everyone was partying and drinking.  Fye said he got into an argument with Munsel over a text message.  Munsel showed Fye the phone, asked him, "What's this?" and then the phone died.

3

Asked if the argument became physical, Fye replied, "Chairs got thrown." Questioned about whether anything other than a chair was thrown, Fye explained that it was dark and they were drinking. Fye also said he "got smacked" by Munsel because she was angry with him. Fye could not remember how many times Munsel hit him. The chair hit Fye in the back of the head. Afterward, Fye had a lump on his head.

Fye denied hitting Munsel that evening. Fye admitted, however, that they had physical altercations in the past in which he "slapped" Munsel. Two chairs were thrown that evening, but Fye ducked away from a wooden chair. Munsel drove home. An hour later, Frazel walked Fye back to his house.

When Fye returned home, he found that a preexisting hole in his kitchen window was now larger. Fye also found the windshield of his 1997 Chevy pickup truck shattered and a microwave oven on the hood. The microwave had been in the back of the truck because it was broken. It was very heavy because it was full of tin cans. There was also a smoldering log in the bed or against the side of one of the vehicles from a nearby fire pit.

Fye also had a green 1983 van with a flat tire. The windshield was cracked. Fye did not remember the crack being there before. Fye described the van as junk and a scrap vehicle. Fye estimated the cost of replacing each windshield was $100 or $150 and the damage to the kitchen window was $20. Fye explained that a friend of his replaced two tires for the van for $20 per tire but did not charge Fye. Although his testimony was not entirely clear, Fye explained that he came home one day and one of the windshields was replaced with a new one at no cost to him. Fye later scraped the van for $300. Fye described the van as "junk." Fye said that he never spent more than $200 or $250 for a windshield and he could install one himself.

Fye called 911 to report Munsel's conduct. The recording of Fye's 911 call was played for the jury. Fye told the dispatcher, "my girlfriend went completely insane at my friend's house and beat the living shit out of me basically and then came back to my

4

house and destroyed my house and [the] windshields of my vehicles." Fye told the dispatcher Munsel's name and gave a general description of Munsel and her vehicle. Fye complained that Munsel had "done this before" and the police were called but nothing happened.

Fye also reported that his neighbor called Fye to inform him that Munsel was at Fye's residence breaking all of his stuff. When asked if he needed an ambulance, Fye replied, "No, No, No, No, No – I'm o … you know, I got …. I'll be fine." Fye thought Munsel could be found at the apartment of a friend and gave the dispatcher the location of the apartment.

Tuolumne County Deputy Sheriff Joseph Morton arrived at Fye's apartment complex at 9:21 p.m. and contacted Fye and Frazel. Fye said that Munsel had hit him in the head with a chair and destroyed his property. Morton saw a lump on Fye's head. The jury was shown a photograph of Fye's injury. Morton conceded that it was difficult to see the lump from the photograph. Morton described the lump as the size of a golf ball behind Fye's ear. Morton described Fye and Frazel as both being very excited and very drunk.

Fye told Morton that they were all drinking when Munsel suddenly came out of the house yelling about a text message. Munsel began swinging at Fye's face with right and left punches. Frazel tried to break up the fighting. Fye was dazed and intoxicated. Munsel then hit Fye in the head with a chair. Munsel followed Fye and hit him a few more times in the face until she got into her truck and drove away.

Fye told Morton that he estimated it would cost $300 to replace each windshield, $100 to replace the tire, and $50 to repair his kitchen window. Fye showed Morton where he thought Munsel had thrown a smoldering log against one of the trucks. Morton did not see any permanent damage to the vehicle.

On December 22, 2011, Morton talked to Munsel and Fye. Fye explained that the two had gotten back together. Fye seemed much more coherent than the evening he

5

reported the attack. Fye said Munsel had already paid him for the tire and was saving money to reimburse him for the windshields. Munsel denied drinking alcohol. Munsel said she only argued verbally with Fye about the text message and that there was no physical contact. Munsel had no explanation for the lump on Fye's head and did not notice any damaged property.

### The January 27, 2012 Incident

On January 27, 2012, Fye was with friends at a barbeque. He had been drinking all day. Fye returned home with Dale Cabral. When Munsel arrived, she was angry with Fye and "smacked" him in the face with her purse. Cabral announced he was calling the police. The jury was shown a photograph of Fye's face.

Fye, who admitted he was drunk, fell down. Fye apparently suffered small scratches from being hit by the purse but fell down onto gravel. Fye believed his face became bloody from hitting the rocks in the gravel. When asked if he hit Munsel that evening, Fye replied, "I don't know."

Cabral testified that Fye was his neighbor. Cabral remembered that the evening of the incident it was dark and there were two silhouettes in front of Fye's residence. Cabral heard a noise, walked around a car, and saw Fye on the ground. Cabral explained that they "were drinking a lot." Cabral only had a vague memory of calling the police. He could not recall talking to the 911 operator or to the investigating officers. Cabral did not remember seeing blood on Fye's face, but explained that it was dark. Cabral explained that he did not want to be involved in this case.

Sheriff's Deputy Michael Pershall testified that Cabral flagged him down when he arrived to the scene. Pershall stated that Cabral was not falling down drunk and appeared coherent. Cabral reported that he was in the backyard with Fye when Munsel drove up. Although Fye told Cabral to go into the house, Cabral walked around the back side to the front of the house and contacted Munsel. Cabral told Pershall he did this because there had been past domestic violence.

6

With a clear view of Munsel and Fye, Cabral saw them argue and tussle. Then Munsel tried to attack Fye. Several times, Fye asked Munsel to leave. Cabral told Pershall he saw Munsel punch Fye in the side of the face and Fye fall to the ground. When Cabral tried to get between the two, Munsel tried to hit him. Cabral got away and called 911.

Fye told Pershall that he told Munsel to leave several times, they got into a fight, Munsel punched him in the side of the face, and Fye fell down. Fye told Pershall that Munsel, "knocked the fucking lights out of me" and tried to swing her purse at him several times. Corporal Kelly Dickson was dispatched to contact Munsel. Munsel denied that anything happened between her and Fye and told him Fye had not touched, grabbed, scratched, shot, or stabbed her. Dickson saw no marks or injuries on Munsel. Munsel thought the neighbors called the police because they did not like her.

*Defense*

Munsel testified that she had been living with Fye since April 2011. Munsel described the relationship as "pretty bad." She had been in a bad spot in her life. They met, moved in together quickly, and "things got volatile." Fye was "drinking a bunch" and taking pain pills.

On December 2, 2011, the power had been out for a day from a windstorm. Fye and Munsel were at the Frazels' home. Munsel saw a text message on Fye's phone that was sexual in nature and very offensive to Munsel. Although Munsel had a few beers, she was not drunk. Fye was drinking.

Munsel got into an argument with Fye and left. Munsel said that as she was leaving, Fye blocked her path. Munsel denied punching Fye or hitting him with a chair. It was possible that Fye threw a chair. Munsel wanted to leave Fye, so she picked up her dogs and left the residence they were sharing.

As for the lump on the back of Fye's head, Munsel questioned whether it even happened on December 2, 2011. Munsel stated that Fye was a mechanic and worked

7

under cars every day. Munsel asserted that the kitchen window had been broken for a while. Munsel described the vehicles in the yard as "junk." Munsel explained that she did not damage Fye's vehicles.

Munsel said that on January 27, 2012, she was with her friend Brian, someone Fye did not like. Munsel was still living with Fye. Fye walked out the front gate as Munsel pulled up in her vehicle. Before she exited the truck, Fye started kicking in her door right next to her face. Fye was wearing big boots and was furious. Munsel exited the car and yelled at Fye to stop. Fye told Munsel she had to leave and physically pushed her back into her truck. They then proceeded to tussle on the gravel. Munsel felt beat up. Her sweatshirt hood was torn almost all the way off. When she was arrested, she noticed an earring had been ripped out of her ear. According to Munsel, Fye threw her on the gravel six or seven times. The neighbors were rooting on Fye. Munsel pled for them to call the police.

Cabral joined Fye in pushing Munsel into her truck. After falling to the ground, Munsel could not remember what happened. Munsel thought it was possible she scratched Fye's face but did not mean to do so. Munsel felt she was the victim. Munsel denied punching Fye. Cabral was restraining Munsel by her arms, preventing her from going into the house to get her things. Munsel described the incident as two grown men ganging up on her that evening. Munsel left without getting her things and went to Brian's house.

Munsel explained that when she arrived at Brian's home, she tried to clean up in the bathroom. Munsel said she was hysterical and Brian was scared because she had red marks and bruises all over her, as well as bruised knees and skinned elbows. Munsel went to the jail that evening and could not put her arms on the table for four days. Munsel had a mark around her neck from her sweatshirt getting ripped off and a bump on her head. Although Munsel lost an earring, the earring was not pulled through her lobe and there was no blood on her ear.

8

Munsel did not point out to officers that her sweatshirt hood was ripped almost all the way off because she did not notice this until after she was released from jail. When Munsel was being transported to jail, she moaned about her shoulder hurting, but the officer replied to her that Munsel had told him she was not hurt and he was talking on the phone to his girlfriend. It was not Munsel's "style" to report the battery she suffered to police. Munsel loved Fye and did not want to get him in trouble.

## INSTRUCTION ON LESSER INCLUDED OFFENSE

Munsel contends the trial court had a sua sponte duty based on the evidence presented at trial to give an instruction on the lesser included offense in counts II and III of misdemeanor battery. Respondent replies that the evidence was overwhelming and the jury clearly rejected Munsel's testimony that she did not cause Fye's injuries. We find the evidence, however, to be much closer than it is depicted by the respondent and reverse appellant's convictions on counts II and III.

The jury in the instant action was instructed with CALCRIM No. 840 [inflicting injury on a spouse, cohabitant, or fellow parent resulting in a traumatic condition] and CALCRIM Nos. 3470 and 3471 [self defense]. The jury was not instructed with CALCRIM No. 841 [simple battery against a spouse, cohabitant, or fellow parent].

A trial court commits error if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. Trial courts are not obliged to instruct on theories that have no evidentiary support. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*); *People v. Moye* (2009) 47 Cal.4th 537, 556.)

The People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence. The broader interests of the sua sponte duty rule are that it avoids presenting the jury with an all-or-nothing choice, ensures a verdict no harsher or more lenient than merited by the evidence, and protects the truth ascertainment function of the jury. The rule seeks the most accurate possible judgment

9

by ensuring the jury's consideration of the full range of possible verdicts included in the allegations. (*People v. Smith* (2013) 57 Cal.4th 232, 243-244 (*Smith*), citing *Breverman*, *supra*, 19 Cal.4th at p. 155.)

The sua sponte duty to instruct on lesser included offenses arises even against the defendant's wishes and regardless of the legal theories or trial tactics the defendant has pursued. The existence of any evidence, no matter how weak it is, will not justify instructions on a lesser included offense. Instructions are only required whenever the evidence that the defendant is guilty only of the lesser offense is substantial enough to merit the jury's consideration. In this context, substantial evidence is evidence from which the jury could conclude the lesser offense, but not the greater offense, was committed. In deciding whether there is substantial evidence, evaluation of the credibility of witnesses is for the jury not the courts. (*Breverman*, *supra*, 19 Cal.4th at p. 162.) Failure to instruct sua sponte on a lesser included offense in a noncapital case is not subject to reversal unless an examination of the entire record establishes a reasonable probability the error affected the outcome. (*Id.* at pp. 165-179; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Misdemeanor battery of a spouse is proscribed by section 243, subdivision (e)(1), and is a lesser included offense of felony infliction of corporal injury on a spouse (§ 273.5, subd. (a); *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1457; *People v. Jackson* (2000) 77 Cal.App.4th 574, 580 (*Jackson*).) The court in *Jackson* held that section 273.5 "is not violated unless the corporal injury results from a direct application of force on the victim by the defendant." (*Jackson*, *supra*, 77 Cal.App.4th at p. 580.)

Regarding the first incident, respondent argues that there was no evidence to support the lesser included offense other than Munsel's speculative observation that Fye worked as a mechanic and could have obtained the knot on his head working underneath a car. Respondent argues that Munsel's defense that she was merely trying to leave the Frazel home was rejected by the jury. Respondent makes similar arguments concerning

10

the second incident, pointing out that the jury necessarily rejected Munsel's defense that she only accidentally scratched Fye. Respondent argues Munsel failed to tell investigators she was thrown to the ground, the evidence against Munsel was overwhelming, and that it is not reasonably probable Munsel would receive a more favorable outcome had the misdemeanor spousal/cohabitant instruction been given as to either count.

We observe that the case against Munsel was not as strong as respondent asserts. Both Fye and Frazel were very intoxicated the evening of the first incident. Neither witness described in detail the sequence of Munsel's alleged assault of Fye. The prosecution's evidence amounted to flying chairs and punches being thrown only by Munsel, not by Fye or Frazel.

Fye, however, admitted slapping Munsel in the past. Munsel testified that Fye blocked her way as she was trying to leave. We agree with Munsel's appellate counsel that the testimony of flying chairs, punches being thrown, the intoxication of the participants, and Fye's past violent history with Munsel are consistent with a general melee. One implication of a melee is that Munsel was not the only participant. It is thus reasonably possible that Fye was injured accidentally without any intent by Munsel to cause him trauma. Frazel explained during his testimony, for instance, that Munsel did not directly strike Fye while holding a chair and swinging it over her head and down onto Fye.

Munsel also provided a possible explanation as to how Fye could have come by the knot on his head working underneath vehicles at his job as a mechanic. Considering all the facts surrounding the first incident, we find there is substantial evidence from which the jury could conclude that Munsel did not directly cause the trauma suffered by Fye and therefore committed misdemeanor spousal/cohabitant battery rather than felony spousal/cohabitant battery.

11

The second incident involved two totally separate depictions of events. Fye described an angry Munsel who hit him in the face with her purse, causing him to fall to the ground into the gravel. Munsel testified that when she drove up to Fye's home, he started kicking at her car door near her face. By her account, Fye was also drunk. Munsel described a scuffle between the two that started with Fye pushing her into her truck and ended with them falling down into the gravel. Fye himself testified the scratches on his face were caused by the gravel, not from Munsel hitting his face with her purse. There is substantial and reasonable evidence in the record from both Munsel and the prosecution's percipient witnesses from which the jury could conclude that Munsel did not directly cause the trauma to Fye's face.

In marshalling the facts against Munsel in its reply brief, the respondent argues those facts in support of the judgment and is dismissive of facts supporting a potential finding by the jury that Munsel committed the lesser included battery offense. Our task is not to merely search for sufficient evidence to support the verdict when there is evidence supporting an instruction for a lesser included offense. We must determine if there is sufficient, plausible evidence to support a finding of a lesser included offense, as long as it is reasonably possible the result at trial would have been different had the missing instruction been given.[2]

The evidence of Munsel's guilt was not so overwhelming, and her explanation of events so completely implausible or unsupported by any evidence, as to not warrant the

---

[2]     Our Supreme Court noted that a defendant has the constitutional right to have a jury determine every material issue presented by the evidence at trial and the erroneous failure to instruct the jury on a lesser included offense constitutes a denial of that right. The court, apparently reasoning arguendo, evaluated the evidence under the more stringent standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18 and found the defendant's argument in that case to be unconvincing. (*People v. Elliot* (2005) 37 Cal.4th 453, 475-476.) If we were to apply the *Chapman* standard of review to the instant action, we would find that the trial court's failure to sua sponte instruct the jury on the lesser included offense was not harmless beyond a reasonable doubt.

lesser included instruction. The rule that the trial court has a sua sponte duty to give the lesser included offense instruction seeks the most accurate possible judgment by ensuring the jury's consideration of the full range of possible verdicts included in the allegations. (*Smith, supra,* 57 Cal.4th 232 at pp. 243-244, citing *Breverman*, *supra*, 19 Cal.4th at p. 155.)

We cannot say with confidence that the jury here considered the full range of possible verdicts on counts II and III. During its deliberations, the jury requested readback of the testimony of most of the witnesses. The jury further found that Munsel's violation of section 594 was a misdemeanor, not a felony.[3] The jury carefully deliberated Munsel's culpability, but its deliberation was limited by the absence of the lesser included offense instruction. On this record, we believe it is reasonably probable that Munsel would have received a better result on one or both of the felony spousal/cohabitant battery counts had the jury been instructed on the lesser included offense of misdemeanor spousal/cohabitant battery pursuant to the trial court's sua sponte duty to do so.

## DISPOSITION

The judgment on counts II and III is reversed and the case remanded to the trial court for further proceedings. The judgment on count I is affirmed.

---

**3** Munsel alternatively requests that this court exercise its authority under section 1260 to reduce counts II and III to misdemeanors. The facts here are close and with ambiguities that the trier of fact is in a far better position to resolve than this court. We therefore decline Munsel's invitation to reduce counts II and III to misdemeanors and find that this is a matter for the trier of fact to resolve should the People elect to retry Munsel on counts II and III.

13