Filed 8/18/15  P. v. Ambriz CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRIS AMBRIZ,<br><br>    Defendant and Appellant. | B254690<br><br>(Los Angeles County<br>Super. Ct. No. VA128293) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John A. Torribio, Judge.  Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found appellant Chris Ambriz guilty of: attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, 187, subd. (a); count 1);[1] shooting at an occupied motor vehicle (§ 246; count 2); assault with a semiautomatic firearm (§ 245, subd. (b); count 3); assault with a firearm (§ 245, subd. (a)(2); count 4); and possession of a firearm by a felon with two priors (§ 29800, subd. (a)(1); count 5). The jury found true the allegations that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)), and that appellant used a firearm in the commission of counts 2, 3 and 4 (§§ 12022.53, subds. (b) & (c)), 12022.5). Appellant was sentenced to a total of 35 years to life, consisting of 15 years to life on count 1, plus a consecutive term of 20 years for the section 12022.53, subdivision (c) enhancement. The sentences on the remaining counts were stayed pursuant to section 654.

Appellant contends the evidence was insufficient to support the jury's findings that the attempted murder was deliberate and premeditated and that the gang allegations were true. He also contends the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of attempted manslaughter. We find no merit to these contentions and find appellant's remaining contentions moot. The judgment is affirmed.

## FACTS

**The Shooting**

In the early afternoon of October 3, 2012, appellant, a member of the Carmelas gang, and his girlfriend Crystal Martinez (Martinez) left the motel where they were staying in Buena Park and drove around in a white Ford Expedition (the SUV).[2] Appellant received a phone call from a man, and spoke with him through a feature on his cell phone that operated like a walkie-talkie. After speaking with the man, appellant

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Martinez was handcuffed and wearing county jail blues while testifying. She had been arrested for failing to respond to a subpoena to appear in court for this case. She failed to appear because she was scared; she did not want to testify and had been harassed in custody.

2

drove to the parking lot of a Jack-in-the-Box restaurant in Bellflower.  As appellant and Martinez sat in the parking lot, appellant continued to speak with the man on the walkie-talkie.

Los Angeles County Sheriff's Sergeant Marc Boskovich was also in the parking lot as part of an undercover narcotics sting operation.  He was inside a green Ford Windstar minivan (the minivan) with tinted windows, and he was not in uniform.  One of Sergeant Boskovich's partners had made a deal over the phone to buy methamphetamine, which was supposed to be delivered to the parking lot by an unknown person.  Sergeant Boskovich monitored the parking lot, trying to determine who might be delivering the drugs.  After he had been there for about 10 minutes, a black Dodge Caravan (the Dodge) parked directly next to him for about five minutes.  A Hispanic male with a distinctive mustache was in the Dodge, talking to someone via the walkie-talkie mode of a cell phone.  Sergeant Boskovich also noticed the SUV in the parking lot, but he did not see appellant or Martinez.  The sting operation was eventually called off.

Sergeant Boskovich exited the parking lot in the minivan.  The Dodge drove toward a different exit, and appellant followed in the SUV.  Appellant was still talking over the walkie-talkie.  According to Martinez, the man told appellant that the person in the minivan had stolen something from him.  The man said, "That's the guy, that's the guy."  Appellant repeatedly asked, "Are you sure?"  The man said, "Yes, I'll never forget his face."  Appellant made an illegal U-turn and began following Sergeant Boskovich's minivan through a residential neighborhood.  The Dodge followed too.  At some point, appellant told Martinez that the person in the minivan was from the Varrio Norwalk gang and had stolen something from appellant's friend.

Sergeant Boskovich noticed the SUV and the Dodge following him into a residential neighborhood.  As the minivan slowed for a dip in the road, appellant stuck his left arm out of the driver's side window of the SUV, holding a gun and fired multiple shots at the minivan.  Sergeant Boskovich sped up and radioed for help.  Appellant continued to follow and shoot at him.  During the chase, Sergeant Boskovich lost sight of the Dodge.

3

An unmarked police car drove toward the SUV and Martinez told appellant, "There is a cop." Appellant pulled his arm back inside the SUV and swerved to avoid the police car. Officer Richard Torres, who was in the police car, saw appellant driving the SUV and Martinez in the passenger seat. Martinez testified that appellant drove onto the freeway and went to his friend Irene's house in South Central. Officer Torres and Sergeant Boskovich tried to follow, but they lost sight of the SUV. Appellant left the SUV at Irene's house and told her to cover it. Appellant and Martinez returned to the motel.

**The Investigation**

When Sergeant Boskovich finally exited his minivan, he saw a bullet hole on the driver's side rear bumper. Several casings and expended bullets were found in front of houses in the neighborhood where the shooting occurred. One of the bullets struck the car of a neighborhood resident while she was inside it, shattering the windshield.

Appellant and Martinez were located at the motel later that day. Officer Torres identified them at the scene as the occupants of the SUV that chased Sergeant Boskovich.

The following day police searched Irene's house. There was Carmelas gang graffiti inside the house. The SUV was inside the yard and covered with a tarp. A loaded, black and silver, nine-millimeter gun was found in the bathroom. Forensics testing later revealed that the bullets and casings found at the scene were fired from the recovered gun.

**Gang Evidence**

Los Angeles County Sheriff's Detective Ivania Farias testified as a gang expert. Appellant was a self-admitted member of the Carmelas gang. He had numerous gang tattoos, including on his face, neck, and hand. He had obtained another facial gang tattoo while in custody for this case. The Varrio Norwalk gang was a longtime rival of the Carmelas gang.

The Carmelas gang's primary activities are committing murder, attempted murder, street robberies, bank robberies, assault with deadly weapons, drive-by shootings, narcotics sales, firearms violations, and resisting arrest. Detective Farias explained that

4

gangs commonly commit crimes outside of their claimed territory, such as to attack rival members and conduct narcotics transactions.

Based on a hypothetical scenario rooted in the facts of this case, Detective Farias opined that the shooting was committed for the benefit of the Carmelas gang. Detective Farias explained that when gang members are disrespected, they have to take action to gain back respect. Stealing from a gang member is disrespectful. The shooting served to benefit the gang by instilling fear in the community, so that citizens would be less likely to report future offenses committed by the gang. Having gang tattoos on display was another way to intimidate the community. Gang members notify the public of their crimes through social media, broadcast media, and word of mouth.

**Jailhouse Phone Calls**

Several of appellant's jailhouse phone calls were recorded and played for the jury. In a September 24, 2013 phone call, appellant told his wife Dolores that the prosecution had a warrant out for Martinez. Appellant said Martinez was the reason he was in custody, and that she was going to testify against him. Appellant detailed Sergeant Boskovich's preliminary hearing testimony for Dolores, and told her that a recording of Martinez's statement to the police had been played. He explained that on the recording, Martinez said that appellant shot at the minivan because he thought the occupants were Norwalk gang members, and that he hid the car at Irene's house. Appellant also told Dolores that when Martinez was arrested, she got scared, and took the police to Irene's house. Appellant said he had talked to some "homies," and Martinez was no longer allowed in Carmelas gang territory. Appellant said he had "paperwork" on Martinez. In gang parlance, "paperwork" is a police report or other proof that someone is cooperating with law enforcement. Once paperwork is obtained, a person can be labeled a "snitch" or "rat," and becomes a target for violence from any gang member.

In a September 25, 2013 call, appellant told Dolores that the next time he called, he would need her to make a conference call so that he could tell his "homeboy" to tell "that little hood rat" that "she better make sure she disappears." A "hood rat" is a female who has sexual relationships with more than one gang member.

5

In a September 26, 2013 call, appellant told Dolores that earlier that day he tried to start a fight with a Norwalk gang member, and told the Norwalk gang member that his "little homie" recently shot appellant's brother. Appellant's brother had been shot recently. Appellant explained to Dolores that ever since he found out a Norwalk gang member killed his brother, he decided he would fight any Norwalk gang member, even if they were older. Appellant also told Dolores to call his "homie" to "let him know to make sure that that fucking stupid bitch ass fucking girl, make sure they make her disappear."

In another September 26, 2013 call, appellant told an unknown male to "see what [he] could do" about a witness for whom the prosecution had "issued a warrant."

## DISCUSSION

## I. Sufficient Evidence Established Premeditation and Deliberation

Appellant contends the evidence was insufficient to support the jury's finding that the attempted murder was premeditated and deliberate.

### A. Standard of Review and Relevant Law

A defendant raising a claim that the evidence was insufficient to support his conviction bears a "massive burden" because this court's "role on appeal is a limited one." (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.) "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Hoang* (2006) 145 Cal.App.4th 264, 275.) We do not reweigh evidence, reappraise the credibility of witnesses, or resolve conflicts in the evidence, as these functions are reserved for the trier of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) Reversal is not warranted unless it appears "'that

6

upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

To find that the attempted murder was committed willfully, deliberately, and with premeditation, the jury had to find that appellant's decision to kill was considered beforehand and arrived at as a result of careful thought and weighing of considerations. (CALJIC No. 8.67; *People v. Young* (2005) 34 Cal.4th 1149, 1182.) """The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]""" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

Although not exhaustive, factors that may establish premeditation and deliberation include: (1) planning activity; (2) motive; and (3) method of the attempted murder. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; *People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)

### B. Analysis

Contrary to appellant's assertion, the above-listed factors are present here.

First, appellant engaged in planning activity by bringing a gun to the drug deal. Appellant concedes that he was at the parking lot in response to a call for a drug deal. (*People v. Alcala* (1984) 36 Cal.3d 604, 626 ["when one . . . brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset"].) Appellant also engaged in planning activity by verifying with his cohort that the person in the minivan was someone who had stolen from him, by making the illegal U-turn, and by following the minivan before firing at it. (See *People v. Perez, supra*, 2 Cal.4th at p. 1127 ["premeditation can occur in a brief period of time"]; *People v. Koontz, supra*, 27 Cal.4th at p. 1082 [defendant's arming himself and following the victim demonstrated planning activity].)

Second, appellant's motive demonstrated premeditation and deliberation. Martinez told police the reason appellant shot at the minivan was because he believed a rival gang member was inside who had stolen from appellant's cohort. A motive of gang

7

retaliation alone can be sufficient to establish premeditation and deliberation. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [where motive was gang retaliation, it could be inferred that defendants, who were armed, "formed the intent to commit premeditated and deliberate murder as early as when they asked the driver to turn the car around and return to the gas station to confront [the victims], who fit the profile of retaliatory targets, whether or not they actually belonged to the Crips gang"]; *People v. Sanchez* (2001) 26 Cal.4th 834, 849 ["Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief"]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002 [aiming weapon at victims whom shooter believed to be rival gang members constituted sufficient evidence of premeditation and deliberation].)

Third, the method of the attempted murder demonstrated premeditation and deliberation. Appellant did not simply fire at the minivan as he drove by it; rather, he followed the minivan for some time, fired once the minivan slowed down for a dip, and then fired multiple shots. (See *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1208 ["the manner of the attempted murder, firing numerous rounds at an occupied vehicle, showed the shooting was purposeful"]; *People v. Wells* (1988) 199 Cal.App.3d 535, 541 [defendant's pursuit of the victim and firing of shots in a manner slow enough for him to take careful aim supported a finding of deliberation and premeditation].)

We are satisfied that substantial evidence supported the jury's finding of premeditation and deliberation.

## II. No Sua Sponte Duty to Instruct on Manslaughter

Appellant contends the trial court erred by failing to sua sponte instruct the jury on the lesser included offense of manslaughter based on the theory of heat of passion.

Attempted voluntary manslaughter on a theory of heat of passion is a lesser included offense of attempted murder. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) A trial court has a sua sponte duty to instruct on a lesser included offense only where there is substantial evidence that the defendant is guilty of the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Substantial evidence is not any

8

evidence, no matter how weak, but evidence from which a reasonable jury could find that the defendant was guilty only of the lesser offense. (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

Heat of passion or sudden quarrel manslaughter has both objective and subjective components. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) "The defendant must actually, subjectively, kill under the heat of passion," and the heat of passion must arise from conduct by the victim so provocative that it would cause an ordinarily reasonable person to act rashly and without deliberation and reflection. (*Id*. at pp. 583–584.) Heat of passion manslaughter does not exist where a sufficient "'cooling off period'" has elapsed between the provocation and the killing, for an ordinarily reasonable person's passion to subside and reason to return. (*People v. Moye, supra,* 47 Cal.4th at p. 550; *People v. Daniels* (1991) 52 Cal.3d 815, 868; CALJIC No. 8.43.)

Here, there was no evidence of the subjective component that appellant actually acted under a heat of passion. Martinez did not testify that appellant was acting enraged, uncontrollably, excitably or under any other intense emotion. The only logical inference from the evidence is that appellant was acting out of revenge. (*People v. Breverman, supra*, 19 Cal.4th at p. 163 [while the passion aroused need not be anger or rage, it must be a "'"'violent, intense, high-wrought or enthusiastic emotion'"'" [citation] other than revenge"].) Indeed, appellant's repeated questions to his cohort confirming that the person in the minivan was the person who had stolen from the cohort demonstrates that appellant was thinking clearly and wanted to make sure he shot at the right person. Appellant did not immediately pull out his weapon and fire at the minivan; he followed the minivan and only began firing once the minivan slowed down for a dip in the road. Such calculated behavior is inconsistent with acting under the heat of passion.

Evidence of the objective component was also missing. Although the cohort was adamant about recognizing Sergeant Boskovich as the person who stole from him, the evidence showed that Sergeant Boskovich was sitting in a minivan with tinted windows. Moreover, Sergeant Boskovich did not engage in any provocative conduct; he never exited the minivan. (See *People v. Daniels, supra*, 52 Cal.3d at p. 868 [for heat of

9

passion manslaughter instruction to apply, "the killing must be 'upon sudden quarrel or heat of passion' (§ 192); that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment . . . .'"].)  Even if appellant reasonably believed the person in the minivan had stolen from his cohort, such conduct was not sufficiently provocative to satisfy the objective component of heat of passion manslaughter.  An ordinarily reasonable person would not experience a sudden heat of passion causing him to act rashly and without deliberation under such circumstances.  (See *People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 301 ["a passion for revenge cannot satisfy the objective requirement for provocation"].)

Because there was insufficient evidence of attempted heat of passion manslaughter, the trial court did not err in failing to instruct the jury on this lesser included offense.

## III.  Sufficient Evidence Supported the Gang Allegations

Appellant contends the evidence was insufficient to support the jury's true findings on the gang allegations.  Specifically, appellant argues that the gang expert's opinion that the shooting was committed to benefit appellant's gang had no factual basis because there was no evidence that appellant identified himself as a gang member during the commission of the offense or that the victim or witnesses knew he was a gang member.

The same standard of reviewing the sufficiency of the evidence to support a conviction applies to a true finding on a gang enhancement.  (*People v. Mendez* (2010) 188 Cal.App.4th 47, 56; *People v. Wilson* (2008) 44 Cal.4th 758, 806.)

Pursuant to section 186.22, subdivision (b)(1), "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," shall receive additional punishment.  (§ 186.22, subd. (b)(1); CALJIC No. 17.24.2.)

Here, the logical inference from all the evidence is that appellant and his cohort were at the parking lot to engage in a gang-related drug transaction.  They never exited

10

their vehicles, they were in constant communication via their walkie-talkies, and they coordinated their actions in leaving the parking lot and following the minivan. The evidence also showed that appellant believed the victim was a rival gang member who had stolen from his cohort. Because Sergeant Boskovitch never exited the minivan, appellant relied entirely on what his cohort told him. Thus, the evidence supported the conclusion that appellant committed the offenses not for his own, nongang-related purposes, but for the purposes of benefiting his gang by avenging a disrespectful act by a rival gang member and with the specific intent to promote, further, or assist in criminal conduct by gang members.

While it is true that appellant did not shout out his gang's name or otherwise identify himself as a gang member, the gang expert testified that gangs made their crimes known through social media and word of mouth. Appellant's jailhouse phone calls demonstrated that he had let other gang members and his wife know about the crimes. And the crimes were committed in broad daylight in a residential area, so it would be expected that the community would learn about it.

We are satisfied that substantial evidence supported the jury's true findings on the gang allegations.

## IV. Remaining Contentions on Count 4 are Moot

Appellant's last two contentions focus on count 4. He argues there was no evidence that he knew he was assaulting a peace officer and that the jury was improperly instructed on this offense. These contentions are moot. Appellant focuses on the original information, which charged him in count 4 with assault with a firearm upon a peace officer in violation of section 245, subdivision (d)(1). The original information was amended so that appellant was charged in count 4 with assault with a firearm in violation of section 245, subdivision (a)(2). The amended information superseded the original information.

11

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
               ASHMANN-GERST


We concur:


_____, P. J.
     BOREN


_____, J.
     HOFFSTADT

12