Filed 6/20/23  P. v. Gautier CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TIM RAY GAUTIER,<br><br>    Defendant and Appellant. | 2d Crim. No. B318911<br>(Super. Ct. No. 2021001035)<br>(Ventura County) |

Tim Ray Gautier appeals from the judgment entered after a jury had convicted him of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189, subd. (a).)[1]  The victim was his wife, Gina Gautier (wife).  The jury found true an allegation that he had personally discharged a firearm causing death.  (§ 12022.53, subd. (d).)  For the murder, appellant was sentenced to prison for 25 years to life.  For the firearm enhancement, he was sentenced to a consecutive term of 25 years to life.

---

[1] All statutory references are to the Penal Code.

Appellant contends the trial court erroneously failed to instruct the jury sua sponte on the lesser included offense of voluntary manslaughter based on provocation and heat of passion. In addition, he claims the trial court abused its discretion in denying his request to strike the firearm enhancement. We affirm.

*Appellant's Trial Testimony*

In "determin[ing] whether the trial court had a duty to instruct on a lesser included offense," we must "consider the evidence in the light most favorable to the defendant. [Citation.] We recount the facts below with this standard in mind." (*People v. Miranda* (2021) 62 Cal.App.5th 162, 168.) We rely on appellant's trial testimony.

Appellant testified that wife had severe mental problems. She "cried every day for two weeks." She became paranoid. "[S]he began to think that people were following us." "In late 2020, [wife] barely spoke. Whenever she spoke to me, it would be about things that weren't reality based." "She was consumed with fear." "She thought her [employer] and the Thousand Oaks Sheriff's Department had placed listening devices in the vents in our house." Because of wife's mental problems, "the stress level [at home] was super high. It was a very toxic environment."

In the morning on January 11, 2021, appellant and wife got into an argument. Appellant "grab[bed wife] by the lapel[s of her bathrobe and said] . . . 'Knock it off. What are you doing? Why are you playing games with me?' And she went into a rage." Wife "stabbed [appellant] with a pen." "We're fighting. She's going crazy." "We struck each other."

Appellant said, "'Stop,'" and walked away. "And [wife] began to follow me. Like stalking me." "Like following me

2

around the apartment."  Wife looked in the mirror and said, "'Look what you did to my face.'"

Appellant "noticed that [his] arm's bleeding."  He said, "'I'm going to take a photo of [the blood], and I'm calling the police.'"  Appellant walked into the kitchen to take the photograph.  Wife "whacked" him on the head with a frying pan.

Appellant testified: "I got hit.  I don't know what it was.  I didn't know what happened.  All I know is it went black.  I didn't know where I was.  Honestly, I didn't even know if I was dead or alive."  "The next thing I remember happening is I'm stumbling out in the living room . . . .  I don't know how I got there."

Appellant walked into the bathroom, looked in the mirror, and saw "a knot on my head, above my right eye."  He said to wife: "'Look what you did to my head' . . .  Im going to shoot you.'"

Appellant continued: "I was fearing for my life.  I thought she was going to kill me.  So I ran . . . back to [the bedroom to] get the gun."  The firearm – a nine-millimeter semi-automatic handgun – was under the bed inside a safe.  Appellant opened the safe and removed the gun.

Wife was standing by the open front door.  She was not holding the frying pan.  Appellant "turn[ed] around to put the gun away.  But as I was walking . . . , the Holy Spirit said, she may hit me in the back of the head.  I was scared at that point.  So I turned [around], and there she is with that pan."  Wife advanced toward appellant.  She raised the pan upward as if she were going to strike him with it.

"At this point," appellant was "totally confused.  The room is starting to spin.  My head feels like it's going to explode, like literally inflating.  Like somebody's putting helium in it."

Wife started "[b]acking away from me with the pan." "[S]he's walking back saying, 'You're going to shoot me. You're going to shoot me.[']  And all I remember is yelling, screaming, head feeling like it's going to explode, ringing in my ears."

Appellant "just started shooting at that point."  "I just started firing the gun because I don't want to die."  "She already hit me with that pan once, blind sided me.  I'm not dying here."  "After the shots rang out, I couldn't believe I shot her.  I was in shock."

On redirect examination, appellant was asked, "Are you shooting your wife because you think you are going to get assaulted with that pan again?"  Appellant answered: "Absolutely.  *That's the only reason I shot my wife*."  (Italics added.)  "I'm afraid I'm going to die."  Appellant was asked, "You didn't shoot your wife because you were mad at her?"  Appellant responded, "No.  I shot my wife because I thought I was going to die."

### Appellant's 911 Call

After the shooting, appellant called 911.  He told the operator that he had just shot his wife: "She got shot, she hit me with a pan and . . . I shot her.  She was coming at me."  "She came at me with a frying pan . . . ."  "She's fuck'n dead."  "I tried everything to help her. . . .  [B]ut she was having a mental break down . . . ."

### Cause of Death and Other Injuries

The cause of death was "multiple gunshot wounds."  Wife was shot twice.  One of the bullets perforated her heart.  Wife had sustained recent bruising to her face, eyelid, and lips.

4

*Jury Instructions Given*

The jury was instructed on first and second degree murder (CALCRIM Nos. 520, 521), the effect of provocation on the degree of murder (CALCRIM No. 522), lawful (reasonable) self-defense (CALCRIM Nos. 505, 3471, 3472, 3474), and voluntary manslaughter based on imperfect (unreasonable) self-defense (CALCRIM No. 571).

*Jury Instruction Not Given: Voluntary*
*Manslaughter Based on Heat of Passion*

The omitted instruction, CALCRIM No. 570, provides:

A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

The defendant killed someone because of a sudden quarrel or in the heat of passion if:

1. The defendant was provoked;

2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

AND

3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of

5

conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

*Duty to Instruct Sua Sponte on Lesser*
*Included Offense and Standard of Review*

"[W]hen the evidence suggests the defendant may not be guilty of the charged offense, but only of some lesser included offense, the jury must be allowed to 'consider the *full range* of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties,' so as to '*ensure* that the verdict is no harsher or more lenient than the evidence merits.' [Citations.] . . . [R]egardless of the tactics or objections of the parties, or the *relative* strength of the evidence on alternate offenses or theories, [this] rule requires sua sponte instruction on *any and all* lesser included offenses, or theories thereof, which are *supported* by the evidence. In a murder case, this means that both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 160.) ""Substantial evidence" in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"' that the lesser offense, but not the greater, was committed. . . .'" (*People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*).) "In deciding whether evidence is "substantial" . . . , a court determines only its bare legal

6

sufficiency, not its weight." (*Id*. at p. 556.) "We review de novo a trial court's failure to instruct on a lesser included offense . . . ." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

### *Any Error in Failing to Instruct Sua Sponte on Heat of Passion Voluntary Manslaughter Was Harmless*

We need not decide whether the evidence is substantial enough for a "reasonable juror [to] conclude [that, as a result of sufficient provocation, appellant had] acted ""rashly or without due deliberation and reflection, and from this passion rather than from judgment,"' . . . "" when he shot wife. (*Moye*, *supra*, 47 Cal.4th at p. 553.) "Assuming arguendo it was error to fail to instruct on heat of passion voluntary manslaughter on this factual record, we find any such error harmless under the applicable *Watson* test (*People v. Watson* (1956) 46 Cal.2d 818, 836 . . .)." (*Id*. at p. 541.) "[A]ny such error was harmless [under this test] as it is not reasonably probable [appellant] would have obtained a more favorable outcome had the jury been so instructed." (*Id*. at p. 556.) Appellant erroneously claims that "[t]he standard of prejudice . . . is harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 . . . ."

"In employing the *Watson* standard of review here, it is reasonable to assume the jury considered all of the defense evidence bearing on [appellant's] state of mind and the question whether he harbored malice when it entertained *and rejected* his claims of reasonable and unreasonable (or imperfect) self-defense." (*Moye*, *supra*, 47 Cal.4th at p. 556.) "Once the jury rejected [appellant's] claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to

7

support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*Id.* at p. 557.) Appellant testified that "the only reason" why he shot wife was that he feared she would assault him again with the frying pan. "[T]he jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter." (*Ibid.*)

Moreover, the jury found appellant guilty of first degree murder. Pursuant to CALCRIM No. 521, the trial court instructed the jury: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused the death." Based on this instruction, the jury "must have believed the evidence showed [appellant] shot [wife] with 'a state of mind equivalent to deliberation or premeditation' . . . . That finding cannot be reconciled with a finding [appellant] . . . lacked malice because [wife's] conduct provoked in [him] an 'emotion so intense that an ordinary person would simply *react,* without reflection.'" (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1497.)

Our Supreme Court applied similar reasoning in *People v. Wharton* (1991) 53 Cal.3d 522, 572: "By finding defendant was

8

guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction."

Finally, "the jury was instructed on second degree murder, and accordingly had a choice in evaluating [appellant's] culpability." (*People v. Avila* (2009) 46 Cal.4th 680, 707.) The jury was instructed: "Provocation may reduce a murder from first degree to second degree . . . . [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first . . . or second degree murder." The jury rejected a second degree murder verdict. "[W]e conclude that the jury in this case, by rejecting the lesser-included offense of second degree murder [and convicting appellant of first degree premeditated murder], necessarily rejected the factual basis upon which it might have rendered a verdict on the lesser-included offense of [heat of passion] voluntary manslaughter." (*Turner v. Commonwealth* (Va.App. 1996) 476 S.E.2d 504, 508, fn. omitted, affirmed by *Turner v. Commonwealth* (Va. 1997) 492 S.E.2d 447.)

Thus, "it is not 'reasonably probable' [appellant] would have obtained a more favorable outcome at trial had a heat of passion instruction been given." (*Moye, supra*, 47 Cal.4th at pp. 557-558.)

*Appellant Has Failed to Show that the Court Abused Its Discretion in Refusing to Strike the Firearm Enhancement*

The trial court denied appellant's request to strike the firearm enhancement in furtherance of justice pursuant to

9

sections 1385 and 12022.53, subdivision (h).  We review its decision for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'"  [Citations.]  Second, a "'decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.''"  [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

Appellant has failed to carry his burden ""'to clearly show that the sentencing decision was irrational or arbitrary. . . ."'"  (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)  In his opening brief appellant makes a perfunctory, undeveloped argument that the trial court abused its discretion: "Given, appellant's age, of 57 years, lack of prior criminal record and the unique circumstances of the offense, the court's failure to strike the firearm [enhancement] was an abuse of discretion."  Appellant also claims the trial court abused its discretion because "[a]bsent the firearm enhancement, appellant's sentence would still have been 25 years to life."

10

Appellant does not mention the trial court's detailed, careful analysis of the firearm enhancement at the sentencing hearing. The court considered each of the nine mitigating circumstances listed in subparagraphs (A) through (I) of section 1385, subdivision (c)(2). Subdivision (c)(2) provides, "In exercising its discretion [whether to strike an enhancement] under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." The court explained why none of the mitigating circumstances applied.[2] Appellant does not dispute this finding.

_____

[2] The nine mitigating circumstances are:

"(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

"(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed.

"(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed.

"(D) The current offense is connected to mental illness.

"(E) The current offense is connected to prior victimization or childhood trauma.

"(F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5.

"(G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal

11

The trial court expressed concern that appellant's comments about the offense "seem to show a defiance as to what happened, not any remorse for what happened."  The court believed that these comments indicate "there still is a potential for a danger to public safety and a risk to physical injury to someone else if [appellant] were released" at a future date.

The court found only a single mitigating factor – appellant's lack of a criminal record.  As an aggravating factor, the court found that appellant's conduct showed "sophistication or planning."  The court stated: "You [appellant] watched a [You]Tube video shortly before the murder on how to fire the gun. You're heard muttering as you go get the gun.  [']Self-defense.['][3] You get the gun.  The shooting isn't immediately after you're hit in the head with the frying pan.  The shooting takes place after you told her 17 times to close the [front] door.  She doesn't close the door.  She says the reason she doesn't close the door is

---

convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.

"(H) The enhancement is based on a prior conviction that is over five years old.

"(I) Though a firearm was used in the current offense, it was inoperable or unloaded."  (§ 1385, subd. (c)(2), subparagraphs (A)-(I).)

[3] Here, the trial court was referring to what it had heard while listening to audio recordings of events inside appellant's residence around the time of the shooting.  The audio recordings were played for the jury.  The audio was captured by security cameras that appellant had installed.  There were three cameras. "One was in the kitchen, one in the living room and another one was inside the guest bedroom."

because she's afraid you're going to shoot her.  You say if I was going to shoot you I would have already done it, and then you shoot her not once, but twice."

As an additional aggravating factor, the court found: "The victim was particularly vulnerable.  She was unarmed, and apparently . . . was suffering from some level of mental illness."

"The court's detailed explanation of its reasoning demonstrates that, as directed by section 1385(c), it engaged in a [w]holistic balancing with special emphasis on the enumerated mitigating factors."  (*People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1096, review granted 4/12/23, S278894.)  In his opening brief appellant fails to present any analysis of the court's reasoning.  He simply ignores it.

In his reply brief appellant responds to the trial court's reasoning by arguing: "The potential danger to public safety if appellant, who was 57 at the time of sentencing, were to bec[o]me eligible for parole in 25 years was non existent.  First of all, if despite his old age the parole board considered him a danger they would not be required to parole him.  In all likelihood his mental health issues which played an important part both in the offense and in his statement at sentencing would be addressed during his first 25 years in prison.[4]  If so his rationality, if not fragility, would prevent him from being a danger to the public.  If not he would remain in prison.  The evidence that the court and respondent see . . . as evidence of premeditation, buying a gun

---

[4] But the trial court found that appellant's commission of the offense was not connected to any mental illness on his part. The court said, "[T]he predominant theme throughout the trial certainly was mental illness, but it was mental illness of Gina [wife], it wasn't mental illness of the defendant."

13

and trying to figure out how to shoot it was more likely due to the same fear or paranoia that caused him to put up the elaborate security system. While under normal circumstances buying . . . a gun and learning to shoot could be seen as evidence of planning, installing the security system indicates otherwise." Appellant omits to mention that although the gun was purchased in 2019, it was not until January 9, 2021 – two days before the murder – that appellant viewed a YouTube video "on how to properly grip a semi-auto pistol handgun." (Capitalization omitted.)

Appellant does not consider other aspects of the trial court's reasoning, e.g., the inapplicability of the mitigating factors listed in section 1385, subdivision (c)(2), subparagraphs (A) through (I); the finding that wife "was particularly vulnerable"; and the finding that appellant's comments about the offense "seem to show a defiance as to what happened, not any remorse for what happened."

"[I]t is settled that: 'A judgment of the lower court is *presumed correct*. . . . [E]rror must be affirmatively shown. . . .'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Because appellant has failed to clearly show that the trial court's reasoning for refusing to strike the firearm enhancement was irrational or arbitrary, the ""'court is presumed to have acted to achieve legitimate sentencing objectives . . . .'"" (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

*Disposition*

The judgment is affirmed.

14

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Marilee Marshall, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.