Filed 11/22/24  P. v. Nunez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B330442 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA496144) |
| v. | |
| JOSE ANGEL NUNEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted defendant Jose Angel Nunez of first degree murder (Pen. Code, § 187, subd. (a))[1] for fatally shooting Juan Leon at Leon's home in South Los Angeles. Nunez does not deny that he killed Leon. Instead, he testified that Leon was his friend and that the shooting was an accident. Nunez contends we must reverse his conviction because there was no substantial evidence that he acted with premeditation and deliberation, and because the trial court erred by failing to instruct the jury sua sponte on voluntary manslaughter under a heat of passion theory. We disagree and affirm, as we explain below.

## FACTS AND PROCEEDINGS BELOW

On May 6, 2021, Nunez and his girlfriend, Sandy T., took a train from their home in San Bernardino to Los Angeles. Leon picked them up and drove them to another location where Nunez had left his white Porsche SUV. Nunez and Sandy drove back to Leon's home in the SUV, arriving at around 5:30 p.m. According to Sandy, Nunez and Leon were friends, and they "smok[ed] weed and wax" together that afternoon. There was a gun on Leon's table, and Sandy saw Leon playing with it or handling it. Around 6:50 p.m., the three went out to get food, returning about 20 minutes later.

Later that evening, a neighbor, Javier B., was sitting in the driver's seat of his van, which was parked on the street outside Leon's home, when Nunez left the house and walked toward the white SUV. The SUV was double-parked on the street near Javier's van, and Nunez asked Javier if the SUV was in his way.

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

Javier said it was not. Nunez opened the door of the SUV, took out an object, and went back inside. Javier was not paying close attention and did not see what the object was.

Soon afterward, Sandy was in the restroom and heard Nunez and Leon arguing. Sandy "was really high" at the time and was not paying attention to the conversation, so she did not remember what they were arguing about. Sandy acknowledged telling police that Nunez and Leon "always fight," but she did not believe the fights were serious. As she was walking out of the bathroom, Sandy heard a loud noise like a gunshot. She saw Leon's body lying on the floor. Nunez ran out the door, and Sandy followed.

Javier was still sitting in his van outside the house as these events took place. He heard the gunshot and saw Nunez and Sandy run out of the house. Sandy was unable to open the door of the SUV until Nunez helped open it. Nunez then walked toward Javier and said in Spanish, "You didn't see anything." Nunez had a black semiautomatic pistol in his hand and, although he did not point it at Javier, "he made me know that he had a weapon" by making a motion with it. Javier interpreted the statement as "a clear threat to my life."

Javier testified that "[b]etween five and ten minutes" passed from the time Nunez first went out to the car until he heard the gunshot. Time stamps on surveillance videos from a nearby home indicated that the first encounter between Nunez and Javier took place at 7:57 p.m., and that Nunez came out of the house after the shooting at 8:03 p.m. After Nunez drove away, Javier called 911.

Police officers arrived at the scene and found Leon lying face down and unresponsive on the floor of the living room with a

3

pool of blood around his head.  They also found a single nine-millimeter casing on the floor.  A medical examiner determined that Leon died of a single gunshot to the head fired from intermediate range.  The bullet struck Leon on the right posterior side of his head, traveled upward and toward the front and left, and exited on the left posterior side.

Detectives recovered Leon's cellphone and were able to extract some data from it, including a video showing Leon's table with two firearms on it.  Metadata for the video showed a time stamp of 6:45 p.m. on May 6, 2021, about one hour before the shooting.  A detective testified that the video had most likely been created at the time indicated by the time stamp, but because officers had been able to access only part of the data on the phone, it was possible that the video had been created earlier and was merely accessed, modified, or sent to the phone at 6:45 p.m.

Nunez testified in his own defense.  He stated that he and Leon were friends and hung out three or four times a week.  According to Nunez, when he arrived at Leon's house, he saw one of the two guns from Leon's phone video sitting on his table.  It was a black handgun with a golden handle.  He did not see the other gun depicted in the video.  Nunez, Leon, and Sandy left the house twice that afternoon—first to pick up Nunez's SUV from a friend's house, and then to get food at a Burger King.  When they returned, they continued hanging out.  Then Nunez picked up the gun from Leon's table while Leon was digging through a drawer looking for something.  Nunez testified that he picked the gun up because "[i]t . . . intrigued me . . . .  It looked nice."  At first, Nunez was holding the gun in his open palms.  Then he tried to grab it in one hand.  His finger inadvertently went in the trigger

4

well, and the gun went off: "I guess I squeezed a little too hard." Nunez did not remember whether the hammer was pulled back when he picked up the gun. The noise from the gunshot startled Nunez, and he turned and saw Leon lying on the floor.

Nunez testified that he did not call 911 because he was "scared" and "really didn't know what to do." He had "had incidents with officers" in the past and was afraid they would not believe him if he told them that the shooting was an accident. He acknowledged that he told Javier "you didn't see anything," but claimed he said it as a question, in the hope that Javier might have witnessed the shooting through the front door and would be able to corroborate his story. He denied that he used the gun to try to intimidate Javier. Nunez drove away, "just trying to get away from there." He testified that he threw the gun in a dumpster nearby as he drove away, and did not remember where he went after that, but eventually went back home. In the days afterward, he never told Sandy or anyone else what happened.

A police detective testified that the gun in the video that Nunez identified as the one with which he shot Leon appeared to be a Beretta. According to the detective, a Beretta has two different firing positions. When the hammer is cocked, it requires about five pounds of pressure on the trigger to fire. When the hammer is not cocked, the gun can still fire, but it requires between eight and 14 pounds of pressure on the trigger to do so. The Beretta depicted in the video from Leon's phone did not have the hammer cocked. The other pistol depicted in the video was a Glock. The detective stated that the Beretta depicted in the video appeared to be a nine-millimeter, the same size as the casing found at the scene of the shooting, but the detective could not say what caliber the Glock was. Police were unable to

recover either gun in their investigation, nor did they find any magazines for either weapon.

The People charged Nunez with one count of first degree murder (§ 187, subd. (a)) and one count of dissuading a witness by force or threat (§ 136.1, subd. (c)(1)).[2] The court instructed the jury on first and second degree murder, involuntary manslaughter, and excusable accidental homicide, but not voluntary manslaughter. The jury found Nunez guilty as charged, and found that he personally used a firearm (§ 12022.5, subd. (a)) in the commission of both offenses. The court sentenced Nunez to an aggregate term of 32 years to life in prison, consisting of 25 years to life for murder plus four years for the firearm enhancement, and an additional three years for dissuading a witness.

## DISCUSSION

### A. Substantial Evidence Supported the Conviction of First Degree Murder

Nunez contends we must reverse his conviction for first degree murder because there was insufficient evidence that he acted deliberately and with premeditation in killing Leon. We disagree.

"Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. '[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that

---

[2] The information also charged Nunez with one count of possession of a firearm in violation of probation (§ 29815, subd. (a)), but the trial court dismissed that count before trial upon a motion by the prosecution.

6

is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . .' [Citation.] ' "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]" ' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812.)

The People charged Nunez with first degree murder on the theory that the killing of Leon was "willful, deliberate, and premeditated." (§ 189, subd. (a).) The seminal case interpreting those terms is *People v. Anderson* (1968) 70 Cal.2d 15, in which our Supreme Court set out three categories of evidence relevant to a finding of premeditation and deliberation. These are evidence of planning, or "facts about how and what [the] defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; motive, or "facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and the manner of the killing, or in other words, "facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way." (*Id.* at pp. 26-27, italics omitted.)

As to motive, one could certainly claim the argument that Sandy overheard shortly before she heard the gunshot was what motivated Nunez to kill Leon. But the People eschew any such claim and do not attempt to identify or supply any motive. The prosecution conceded during closing arguments that, "[a]s

7

individuals, we want to know why did Mr. Nunez shoot Mr. Leon. You're not going to get that answer," and that the question of motive was "a question that will remain unanswered." On appeal, the Attorney General likewise does not assert the argument overheard by Sandy is substantial evidence of motive, nor does he point to any other evidence suggesting motive.

We are not bound by this concession. But we need not independently determine whether there was substantial evidence of motive as it is unnecessary to do so. *Anderson* " 'did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081, quoting *People v. Thomas* (1992) 2 Cal.4th 489, 517.) The *Anderson* "factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) Motive and the other "*Anderson* factors are not an exhaustive list of evidence that could support a finding of premeditation and deliberation[, and] the reviewing court need not accord them any particular weight." (*People v. Solomon*, *supra*, 49 Cal.4th at p. 813, citing *People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Substantial evidence supported " 'an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Solomon*, *supra*, 49 Cal.4th at p. 812.) Minutes before the shooting, Nunez went out to his SUV, picked up an item, and returned to the house. When we review for substantial evidence, we " ' "must accept logical inferences that the jury might have drawn from the evidence." ' " (*Id.* at p. 811.) A jury could reasonably find that the item he retrieved from the

car was the murder weapon,[3] and that Nunez waited until Sandy left to go to the restroom, then shot and killed Leon. Alternatively, if Nunez did not retrieve the murder weapon from the car and used the Beretta (which appears already to have been inside the home), this would not undermine the jury's finding of premeditation and deliberation. Our Supreme Court has noted that " ' "[p]remeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' [Citations.]" (*Id.* at p. 812.) The jury could reasonably infer Nunez had to cock the weapon before pulling the trigger, or exert considerable and sustained pressure to fire the uncocked weapon at Leon, and that he waited until Sandy left the room to shoot Leon. Regardless of which gun Nunez used, there was sufficient evidence to support the jury's conclusion that he acted willfully, deliberately, and with premeditation.

Nunez also contends the prosecutor "[d]iluted [t]he [j]ury's [u]nderstanding [o]f [t]he [p]rosecution's [b]urden [o]f [p]roof" by drawing an improper analogy between the premeditation and deliberation required for first degree murder and the decision to proceed when driving a car at a stop sign or stoplight. Nunez does not argue that the prosecutor committed misconduct by making this statement. Instead, he raises the issue as part of his argument regarding the sufficiency of the evidence for premeditation and deliberation. We fail to understand how the

---

[3] Nunez testified that he shot Leon with the Beretta depicted in the video recovered from Leon's cellphone, but there was no physical evidence linking the Beretta to the shooting.

9

prosecutor's comments were relevant to this issue. As we noted above, when we review for substantial evidence, we consider whether the prosecution produced evidence " 'from which a *reasonable* [jury] could find the defendant guilty beyond a reasonable doubt' " (*People v. Solomon*, *supra*, 49 Cal.4th at p. 811, italics added), not whether the prosecutor's argument misled the jury that actually decided the case.

In any case, we see nothing improper in the prosecutor's argument. The prosecutor asked the jury, "So what is premeditation and deliberation? We do it in everyday decisions. When we see these signs, a stop sign and stop lights, we look to the left, we look to the right, we decide if it's safe to enter, and then we go forward. We are premeditating and we're deliberating our actions. That split second is all it takes, and that's what the law tells us." This statement accurately reflects the principle that " ' "[p]remeditation and deliberation can occur in a brief interval" ' " (*People v. Solomon*, *supra*, 49 Cal.4th at p. 812), and, as Nunez acknowledges, courts have rejected challenges by defendants to the use of similar analogies comparing decisions made while driving to the concept of premeditation and deliberation. (E.g., *People v. Avila* (2009) 46 Cal.4th 680, 714-715; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1084-1087.)

## B. The Trial Court Did Not Err in Failing to Instruct the Jury on Voluntary Manslaughter

Nunez contends the trial court erred by failing to instruct the jury on voluntary manslaughter on the theory that he killed Leon in the heat of passion. Nunez did not request such an instruction at trial, nor did he base his defense on a heat of passion theory, but he argues the trial court nevertheless had a

duty sua sponte to instruct the jury on that theory. We disagree, as there was no substantial evidence to support an instruction for voluntary manslaughter.

"In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense." (*People v. Moye* (2009) 47 Cal.4th 537, 541.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7)

Voluntary manslaughter is "a lesser necessarily included offense of intentional murder" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 154) in which a defendant intentionally kills but lacks malice either because he " 'acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or . . . kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.]" (*Id.* at pp. 153-154.) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

Nunez argues that an instruction on voluntary manslaughter was required because of Sandy's testimony that she heard Nunez and Leon arguing just before Nunez fired the

11

gun. We disagree. Sandy testified that she was in the restroom just before the shooting occurred. She acknowledged telling police that Nunez and Leon "always fight" and "that's how they are," but she did not claim to have heard the contents of any argument just before the shooting, and nothing in her testimony suggests she perceived it as more severe than the arguments they "always" engaged in.

Apart from Sandy's testimony, no other evidence introduced at trial indicated that Nunez and Leon argued or fought just before the shooting. Nunez himself denied such an argument took place, and claimed he never engaged in anything more than "little, small quarrels" with Leon. Javier, who heard the gunshot from his position in his van in the street near Leon's house, testified that he did not hear any yelling or arguing from inside the house. Nor did the surveillance video footage, which captured Nunez, Leon, and Sandy going in and out of the house more than once, show any signs of disharmony among them.

In short, there was no evidence that Leon did anything to provoke Nunez to " 'passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection.' [Citations.]" (*People v. Barton*, *supra*, 12 Cal.4th at p. 201.) The trial court did not err by failing to instruct the jury on voluntary manslaughter under a heat of passion theory.

**DISPOSITION**

The judgment of the trial court is affirmed.

NOT TO BE PUBLISHED

                                        WEINGART, J.

We concur:

ROTHSCHILD, P. J.

KLATCHKO, J.*

---

* Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13